THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY LEE McCABE, Defendant-Appellant.

Fifth District    No. 78-397

Opinion filed August 8, 1979.

Paul E. Riley, of Mudge, Riley and Lucco, of Edwardsville, and Donald L. Wolff, of Wolff, Frankel and Passanante, of Clayton, Missouri, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Raymond F. Buckley, Jr., and Curtis L. Blood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendant Jerry Lee McCabe was found guilty of rape and armed violence by a jury in the circuit court of Madison County. He received a term of imprisonment of 20 years for the rape offense and five years for the offense of armed violence. The two sentences were ordered to run concurrently.

Defendant raises the following issues on appeal: (1) whether the trial court erred in denying defendant's motion for a new trial on the basis of the State's failure to comply with certain discovery requirements; (2) whether the evidence supported defendant's convictions beyond a reasonable doubt; (3) whether the trial court erred in failing to rule on the State's motion to amend its original information and by trying defendant on an unverified amended information; (4) whether the trial court erred in allowing evidence concerning the complainant's lack of prior sexual conduct; and (5) whether the trial court erred in failing to grant defendant's motion for a continuance prior to its ruling on his motion for a new trial.

The evidence at trial shows that on February 27, 1978 at approximately 7 p.m. the complainant was raped in the back seat of an automobile located in a parking lot adjacent to the Granite City South High School in Granite City, Illinois. Complainant testified that as she neared the high school to attend a night class she was struck on the head with an object she later described as a crowbar. Next she was grabbed by the neck and pulled through a field to the parking lot where she was shoved into an automobile. She was positioned on the driver's side of the rear seat. The attacker removed her coat, shoes, socks, jeans and panties and proceeded to have sexual intercourse with her against her will. During the ordeal, which lasted approximately 25 minutes, the assailant spent much of the time talking. The complainant was finally permitted to exit the vehicle and was cautioned not to do anything stupid. As she walked back to the high school she heard a car door slam and turned around and observed the man who raped her enter a yellow or white automobile on the passenger side. The latter vehicle then sped off.

Throughout the incident the complainant was unable to get a good view of the man's face. She stated that she was looking down at her feet as she was being pulled through the field. In the automobile she was unable to perceive more than a dim outline of the assailant's face, because the

dome light in the vehicle was inoperable and the parking lot was not lighted. The day after the attack she related to Officer Don Knight that the rapist was husky and roughly 18 to 20 years old with wavy brown hair parted in the middle. She also stated that the attacker was taller than she was, her height being five feet eight inches. A few days later she assisted officers in the construction of a partial composite sketch of the assailant featuring a facial outline, lips and hair. After undergoing hypnosis she was able to add that the man's nose seemed straight and that he had bushy eyebrows with weird eyes. On March 9 defendant was identified by the complainant as the man who attacked and raped her. When cross-examined as to her certainty at the lineup, she replied:

"When I first saw him I was 99% sure. Then when I heard him talk I was really positive."

She made a positive identification of defendant in the courtroom although his appearance changed from the night of the attack. His hair was shortened and was not parted in the middle during the trial.

Complainant identified the automobile she was raped in as being bluish-green with a black vinyl top. She also recalled that there was rust along one of the rear fenders by the wheel. She identified People's Exhibit 13, a black and white photograph of defendant's automobile, as similar to the vehicle she was raped in. Defendant owned a bluish-green 1968 Pontiac with a black vinyl top.

At 7:55 p.m. on the evening of the rape the complainant signed into the emergency room of St. Elizabeth's Hospital in Granite City. Dr. Charles J. LaTenderess examined her and noted a freshly torn hymen as well as a scalp laceration.

Dennis Aubuchon, a serologist testifying for the State, performed various tests on items of clothing worn by the complainant when she was attacked. The tests were designed to isolate and identify foreign substances found on the clothing. Of particular interest are the results of tests conducted on complainant's jeans, coat and panties. Traces of Type B semen were found on the jeans and coat. The panties contained both blood and semen of Types B and O; however, the serologist was unable to assign a specific Type to either the blood or the semen. On cross-examination the following colloquy occurred between the serologist and defense counsel:

"Q. All right. Didn't you tell us that a secreter—that the secretions from a secreter will type the same in the semen as the blood of the person expelling the semen?

A. A secreter with Type B blood would come out with Type B semen also. That is the very nature of the word secreter.

Q. Okay. Is it your testimony then that these secretions were made by a human being of Type B blood?

A. There was a mixture in there. There was Type B and Type O.

Q. Not on the bluejeans was there?

A. Oh, I see, you are talking about the bluejeans. Yes, on the bluejeans there was Type B present.

Q. And the same is true on the leather coat?

A. Yes that is correct."

From a blood sample collected from defendant it was shown that his blood is Type O. The complainant's blood is Type B.

Tests were also conducted on the rear seat of defendant's automobile. A small red stain proved to be Type B human blood. However, the serologist was unable to pinpoint how long the blood had been on the car seat.

Defendant testified in his own defense. He denied any involvement with the attack upon complainant and maintained that he was playing billiards at the time the incident occurred. According to him he was at Plaza Billiards between 7 and 8 p.m. His alibi was corroborated by two of his friends testifying on his behalf. However, a third friend, Mark Hale, testified that defendant left Plaza Billiards around 7 p.m. and got back shortly before 8.

Initially, defendant contends that he was prejudiced by the failure of the State to produce certain discovery items pursuant to Supreme Court Rule 412 (Ill. Rev. Stat. 1977, ch. 110A, par. 412).

The pertinent facts on this issue are as follows. Three young men who played basketball in the Granite City South High School gymnasium were interviewed by Officer Knight concerning the rape of complainant. Mark Linhart told Knight that at approximately 6:30 p.m. on the night of the rape, February 27, he saw an unfamiliar "sloppy looking" male approximately five feet eleven inches tall with long brown hair standing in the gym area. He had a brief conversation with the stranger. Brian Schmidtke related that he saw a similar looking person in the gym. The third youth also saw the stranger and gave a similar description. Knight had Linhart and Schmidtke assist a police artist in preparing composite sketches of the stranger on March 7. Knight then showed the two composites to the complainant, and of the two she stated that the composite drawn at the direction of Linhart more closely resembled her attacker. On March 10 the following police report was prepared by Knight:

"Date       3-10-78

Case No. 78-608

Subject    RAPE

VIC: [Name Deleted]

Reporting Detective talked with DAVID W. LINK, W/M, age 23, 3024 Ash, Granite City, Il., 451-4799. He is the subject that was

seen by the Granite City High School/South Baseball Team on 2-23-78. A composite was made with the help of Bryan [*sic*] Schmidtke and Mark Linhardt [*sic*].

David Link was advised of his constitutional rights by reading the Miranda warning to him. He stated he understood his rights and would talk with me without an attorney present. I asked him was he the one that was at the High School messing around in the gym, while baseball practice was going on. He stated he was. He also admitted he was at the high school on 3-10-78 looking at the pretty teachers. Since a rape suspect had already been arrested, he wasn't questioned as to the incident at the High School on 2-27-78 whereas a young lady was assaulted. It should be noted that one week ago David Link was stopped by the police going house to house on Dale Avenue. His explanation to the police officers was he was looking for a wife.

I advised Mr. Link that he was not to go back on the campus at Granite High School South and if he did return he would be arrested for Trespassing.

David Link is very weird to talk to."

On May 3 defendant filed a motion for discovery requesting among other things all material information within the possession and control of the State which would tend to negate his guilt. Two weeks later a motion for supplemental discovery was filed in which defendant asserted that the State's production of the requested items was incomplete, particularly the State's failure to produce any composite drawings used for identification in the case. On June 26, the first day of trial, a further demand for production was filed. Later in the afternoon on this day for the first time the State furnished defendant with the requested composites as well as the above mentioned police report.

The basic requirements of due process demand that items of discovery in the possession and control of the State must be produced in the face of a defense request where such items are beneficial to the accused and are material to either guilt or punishment. *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

Supreme Court Rule 412(c) and (g) provides in part:

"(c) Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor.

❋ ❋ ❋

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other government personnel, the State shall use diligent good faith efforts to cause such material to be made available to defense counsel; * * *." Ill. Rev. Stat. 1977, ch. 110A, par. 412(c) and (g).

Under the facts of this case, we find the eleventh hour delivery of the thrice requested discovery items to be violative of defendant's due process rights and of Supreme Court Rule 412.

■■ Given the sexual overtones of David Link's erratic behavior and his proximity to the crime with respect to both geography and time, we cannot but say that this information is germane to the question of defendant's guilt, and that it would enhance his chances of acquittal if he were given adequate time to prepare for its proper application. Furthermore, we note that this information was in the possession and control of the State prior to the first discovery request. Such conduct on the part of the State certainly belies "diligent good faith efforts" at getting the requested material to defense counsel.

For the foregoing reasons, we reverse defendant's convictions and remand for a new trial.

Defendant next asserts that the evidence at trial was insufficient to support a conviction. Having examined the facts of this case, we find no merit to this assertion.

As a result of our granting a new trial, a discussion of the other issues is not necessary.


Reversed and remanded.


G. MORAN and KARNS, JJ., concur.