THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WALTER BALL, Defendant-Appellant.

First District (1st Division)    No. 80-763

Opinion filed December 15, 1980.

Best & Maki, P. C., of Mt. Prospect (Robert L. Best, of counsel), for
appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry,
and Theodore F. Burtzos, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of
the court:

After a jury trial, Walter Ball (defendant) was found guilty of
delivery of a controlled substance, to wit, more than 15 grams of heroin
on May 16, 1978. (Ill. Rev. Stat. 1977, ch. 56½, par. 1401(a)(1).) He was
sentenced to 6 years and fined $6000. Defendant appeals.

In this court, defendant contends the State did not prove beyond a
reasonable doubt that he was not entrapped and also, his due process
rights were violated by the State's failure to disclose evidence favorable to
him.

Melvin Alexander, an undercover Chicago police narcotics officer, testified that on May 16, 1978, he telephoned defendant and told defendant he wished to purchase an ounce of heroin. He had spoken to defendant twice before. The two men agreed on a price of $1000 and also agreed to meet 15 minutes later. They did meet in Alexander's car. Defendant gave Alexander a plastic bag containing a brown substance and the officer gave defendant $1000. Officer Alexander had obtained this premarked money from Lawrence Evans, a Federal Drug Enforcement Agent. After defendant left him, Alexander met Evans and two other Chicago police officers, James Arnold and Wayne King. Alexander gave the plastic bag to Arnold. Alexander stated he did not inform anyone other than his fellow police officers of the transaction before it occurred and no one other than fellow police officers participated in the transaction.

Alexander further stated he first met defendant on May 9, 1978, when he bought some heroin from defendant for $100. An informant had arranged that meeting by telephone. Defendant was not arrested after the initial transaction. The officer also purchased heroin on May 12 from defendant.

Officer Arnold testified that on May 16, 1978, while he was with Officer King, he observed defendant leave his residence, enter a car and then drive to where Officer Alexander's car was parked. Defendant entered Alexander's car where he stayed 5 minutes. Defendant then returned to his car and drove away. Arnold and King met Alexander, who handed Arnold a plastic bag containing brown powder. Arnold took the bag to police headquarters. Arnold and King subsequently arrested defendant at his residence on May 22.

Arnold had previously seen defendant on May 9 and 12. Arnold did not set up the May 16 transaction and never contacted the defendant. He had no contact with anyone other than police officers concerning this transaction.

Federal Agent Evans and Officer King corroborated the testimony of Alexander and Arnold as to events that transpired on May 16. Evans also stated he had not discussed the purchase of narcotics on that date with anyone before it occurred. He did not talk to defendant, whom he had seen on one previous occasion. Officer King stated he searched defendant's residence at the time of his arrest on May 22, but none of the premarked bills given to defendant on May 16 were found.

Gerald Pazin, a Chicago police chemist, testified he tested the contents of the plastic bag. The bag contained 24.62 grams of heroin.

Sarah Simmons testified for the defense that she had lived with defendant for 7 years. Defendant had financial troubles in April and May 1978. In April 1978, Simmons and defendant entertained some people at

their home, including a woman named Lee Etta. On May 8, Lee Etta called Simmons and asked to speak to defendant. Simmons gave her a telephone number where defendant could be reached. On May 13, Officer Alexander, using the name "Al", called and asked to speak to defendant. Simmons gave Alexander a number where defendant could be reached.

Defendant testified he was a carpenter working for the city of Chicago. He had never been arrested before. Sometime prior to May 9, 1978, Lee Etta came to defendant's home with some friends. Defendant had known Lee Etta for several years. Defendant told her he was in financial trouble. She told him she knew an easy way to make money. When she told defendant what it was, he told her he wasn't interested and he "was too old for that." Later that evening, he told her he'd think about it and gave her his number at work. Next morning, Lee Etta called him at work and they met in the park. Lee Etta gave him a small package and told him how much money he could make by delivering the package the next day. Defendant put the package in the glove compartment of his car.

The next day, Lee Etta called defendant at work and made an appointment to meet her and "Al" (Officer Alexander). Defendant got there, entered an automobile occupied by Lee Etta and Al, gave Lee Etta the package and was given money. He did not know if "Al" or Lee Etta gave him the money.

The next day, Lee Etta called defendant at work, and they met in the park again. She told him Al was a boyfriend of hers, and she did not want Al to know the package belonged to her. She also told defendant she could make a lot of money from Al and defendant could "make some money by bringing the package to her and Al." Defendant gave Lee Etta $100, the money he had received the night before, and she gave him $20 back. The next day, Lee Etta met defendant in the park and gave him another small plastic bag out of her purse. She told him to keep it until she called. She called defendant that same evening and told him to meet her and Al. They met on May 12 at the same place. At this meeting, defendant handed Lee Etta the package and he was given $500. Defendant then went home. Next day, defendant met Lee Etta at the park and gave her the money. She gave him $50 back.

On May 16, 1978, Lee Etta called defendant at work and then met him at the park. She gave him a larger package and told him to wait at home until she called. However, Al called instead and told defendant "Lee Etta couldn't make it." He told defendant to meet him at the same location. Defendant met Al and gave him the package. Al gave him $1000 in return. Lee Etta called defendant about midnight. They met at a designated time and place. She was with her sister. Defendant gave Lee Etta the money, and she gave him $50 back. That was the last time

defendant saw Lee Etta. Defendant conceded he believed this plastic bag contained narcotics.

After this testimony had been heard, the State acknowledged there was an informant named Lee Etta involved in these transactions. The trial court ordered the police officers to undergo further examination by counsel and ordered the State to produce the informer in court.

Officer Alexander was recalled and testified he met Lee Etta twice prior to May 9, 1978, through another police officer. She had not previously been utilized by the police. To the best of his knowledge she was not then under the influence of narcotics. Lee Etta set up the controlled purchase of narcotics from defendant on May 9. She made a telephone call in Alexander's presence. She then told Alexander he could meet defendant at the time and place the officer had designated to her. Alexander testified he was alone when he met defendant and gave defendant $100 for the package.

On May 10, Alexander, accompanied by Officers King and Arnold, met Lee Etta and told her he wanted to "make another purchase from [defendant]." Alexander called Lee Etta again on May 12 and told her he wanted to buy a certain amount of narcotics from defendant that evening at a certain price. Lee Etta arranged the sale to Alexander that evening. She was paid by the police for arranging the transactions on May 9 and 12.

On May 16, Alexander called defendant himself and arranged the sale for that evening. Lee Etta was not present at the transaction and was not paid for it. Alexander did not know whether Lee Etta supplied the narcotics for any of the transactions between defendant and himself.

Officer King was recalled and testified Lee Etta was paid $66 on May 17. He admitted he previously testified she was not involved in the May 16 transaction. A police "Information Purchase Memorandum and Receipt," signed by Officer King, indicates the money was given to Lee Etta by King for "being instrumental in making arrangements for the purchase of heroin to an undercover police officer, the delivery was for 1-1 oz. of heroin with a purchase price of $1,000 of official advance funds from the Drug Enforcement Administration."

On rebuttal, Lee Etta testified she did not give defendant any illegal drugs between May 1 and May 16, 1978. She had been a police informant for 8 months and had been paid about $126 in total for setting people up for the police department. She had known defendant 2 years. Some time before the May 9 transaction, defendant came to see her at her motel room. He had a half a bag of heroin with him. He showed it to her and told her that if anybody "wants to cop [buy], he was down." She gave this information to Officer Alexander. Lee Etta stated she had arranged the sale on May 16 and was paid by the police for arranging the sales on May

12 and 16. Lee Etta also testified she occasionally used narcotics, including heroin, but was not a narcotics addict. She snorted heroin "Maybe once or twice" in 1978.

Officers Arnold, Evans and King also testified on rebuttal. Evans stated that on May 12, only Alexander and defendant were in Alexander's car. Officers Arnold and King stated they only saw Alexander and defendant in the car on May 9 and 12.

## I.

Defendant raised the defense of entrapment in the trial court. In *People v. Tipton* (1980), 78 Ill. 2d 477, 487, 401 N.E.2d 528, our supreme court held:

> "Once the entrapment defense is raised, it becomes incumbent upon the State to prove beyond a reasonable doubt that entrapment did not occur. (Ill. Rev. Stat. 1975, ch. 38, par. 3—2(b); *People v. Dollen* (1972), 53 Ill. 2d 280, 284.) The question of entrapment in a jury trial, however, is usually one for the jury, unless the trial court or a reviewing court can find entrapment as a matter of law."

In addition, we learn from *People v. Cross* (1979), 77 Ill. 2d 396, 404-05, 396 N.E.2d 812, *cert. denied* (1979), 440 U.S. 974, 59 L. Ed. 2d 792, 53 S. Ct. 210.

> "The entrapment statute, based in large part on the leading case of *Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210 [citation], provides:
>
>> 'A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated.' (Ill. Rev. Stat. 1975, ch. 38, par. 7—12.)
>
> It thus contemplates consideration of whether the idea for the crime originated with the defendant; predisposition as well as governmental involvement must therefore be considered."

The determination of whether a defendant was predisposed to commit the offense rests upon the facts of each case. (*People v. Dempsey* (1980), 82 Ill. App. 3d 699, 702, 402 N.E.2d 924.) In the instant case, the jury was presented with two conflicting versions of what transpired. Defendant contends the State's version is riddled with "totally contradictory and irreconcilable conflicts in the testimony of the informant and

undercover officers" and Lee Etta's credibility is suspect since she was paid by the police for "setting people up" and she was an admitted drug user. Thus, defendant urges a reasonable doubt exists as to his guilt.

We disagree. First, the conflicts in the testimony of the State's witnesses do not rebut the inescapable conclusion that defendant was predisposed to commit the offense and was therefore not entrapped. No witness contradicted Lee Etta's testimony that defendant visited her some time prior to the transaction of May 9. He was carrying half a bag of heroin and told her he was ready to sell to anybody. Further, Lee Etta did not contradict the officers' testimony that defendant met Alexander on three separate occasions to sell Alexander heroin, and the two of them were alone during the actual sale and delivery of the drugs. In fact, Lee Etta expressly denied she gave defendant any drugs between May 1 and May 16. The testimony of the officers is direct and positive that three drug sales were consummated between defendant and Alexander with no other person present.

Lee Etta did state she set up the sale on May 16 and was paid for it. The officers testified she did not set up the sale on May 16 and their testimony was not totally consistent as to whether she was paid for her activities on that day. However, these inconsistencies do not affect the conclusion that defendant was predisposed to commit the offense.

Furthermore, as stated by the supreme court in *People v. Jordan* (1967), 38 Ill. 2d 83, 88, 230 N.E.2d 161:

> "[W]hile contradictions exist in their testimony as to nonmarital events that happened prior to and subsequent to the crime, these factual discrepancies do not vitiate the credibility of the witnesses' entire testimony. * * * Certainly, contradictions and inconsistencies concerning particular details of no consequence can be expected when relating an event that transpired weeks or months in the past; hence, the discrepancies here, being of slight degree and relevance, do not, as defendant further argues, indicate that the above testimony was patently false. Therefore, it is clear that the jury could have validly based its verdict on this testimony * * *."

■■ In contrast, as above shown, we find defendant's testimony thoroughly rebutted by testimony of four police officers and by Lee Etta. The fact Lee Etta was a paid informant and testified she was a drug user may conceivably lessen her credibility. (*People v. Bazemore* (1962), 25 Ill. 2d 74, 76-77, 182 N.E.2d 649.) However, while her testimony does warrant close scrutiny, "it must not necessarily be disbelieved." (*People v. Barney* (1959), 15 Ill. 2d 503, 506, 155 N.E.2d 615.) It was the province of the jury to determine the credibility of this witness. The jury heard and observed

the witness and had an opportunity to compare her testimony with the testimony of other witnesses. Her testimony was corroborated in almost every essential respect by the police officers who testified. (See *People v. Hamby* (1955), 6 Ill. 2d 559, 562, 129 N.E.2d 746.) We cannot say the witness' background presumptively discredits her testimony, particularly in view of her uncontradicted testimony that she was not an addict.

█▋ █ The fact that the police officers and the informer may have "encouraged defendant does not require acquittal * * *." (*Tipton*, 78 Ill. 2d 477, 488.) Furthermore, the fact that defendant has no prior criminal record, although a "factor to be considered on the entrapment issue," is "not sufficient standing alone to show that the defendant was entrapped." *People v. Andreano* (1978), 64 Ill. App. 3d 551, 557, 381 N.E.2d 783.

The jury heard both versions of the events that transpired and found defendant was not entrapped. "A reviewing court may not substitute its judgment for that of the trier of fact 'on questions involving the weight of the evidence or the credibility of the witnesses [citations], and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt.' " *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513, quoting *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.

In our opinion, the State's evidence was strong and convincing beyond a reasonable doubt that defendant was predisposed to commit the offense and was therefore not entrapped.

## II.

Defendant argues his due process rights were violated by the State's failure to comply with the constitutional requirements of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and the disclosure requirements of Supreme Court Rule 412 (Ill. Rev. Stat. 1979, ch. 110A, par. 412).

In *People v. McCabe* (1979), 75 Ill. App. 3d 162, 166-67, 393 N.E.2d 1199, this court stated:

"The basic requirements of due process demand that items of discovery in the possession and control of the State must be produced in the face of a defense request where such items are beneficial to the accused and are material to either guilt or punishment. *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

Supreme Court rule 412(c) and (g) provides in part:

'(c) Except as is otherwise provided in these rules as to protective orders, the State shall disclose to defense counsel

any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor.

\* \* \*

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other government personnel, the State shall use diligent good faith efforts to cause such material to be made available to defense counsel; \* \* \*.' Ill. Rev. Stat. 1977, ch. 110A, par. 412(c) and (g)."

During the course of trial, when the judge determined that defendant had raised the issue of entrapment, he ordered the State to produce the informant and, pursuant to *Brady*, also to produce any information which would show bias or favorable treatment given the informant. The information sought by defendant consisted of documents indicating what funds were paid to the informant by the police for her involvement in this case and other cases and a record of any prior criminal conduct by the informant (B. of I. sheet).

The record indicates delay by the assistant State's Attorney in producing the informant and the information requested pursuant to *Brady*. The careful trial judge delayed trial several times while the information was belatedly being produced by the State. He also admonished the assistant State's Attorney as to his conduct and threatened to impose sanctions if all the requested information was not produced. Eventually, the informer and all information requested were produced with the exception of any document indicating payments to Lee Etta for her work on cases other than defendant's. According to a police lieutenant who testified in chambers, no such documents existed.

Defendant moved for a directed verdict on the basis of prosecutorial misconduct. The trial judge stated that while there had been some "foot dragging" by the State, it did produce the informant as well as the B. of I. sheet and documents showing payments to Lee Etta for her work on defendant's case. Furthermore, all of the police officers were available for further cross-examination and were questioned regarding the documents produced by the State. The trial court specifically ruled that the prosecutorial conduct in the trial did not reach the level required to show a violation of due process.

We agree with this conclusion. There was no violation of defendant's constitutional rights under *Moore, Brady*, and the recent case of *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392.

Furthermore, there was no violation of the disclosure requirements of Supreme Court Rule 412.

This rule is designed "to afford the accused protection against surprise, unfairness and inadequate preparation." (*People v. Boucher* (1978), 62 Ill. App. 3d 436, 439, 379 N.E.2d 339, *appeal denied* (1978), 71 Ill. 2d 618.) The record reveals the able trial judge took every precaution to insure defendant a fair trial. More than once, the judge recessed proceedings in order to make sure the informant would be present at trial and all requested existing documents could be seen by defense counsel before he examined the State's witnesses on recall. Therefore, although we do not approve the conduct of the prosecution, upon the entire record, we are obliged to conclude defendant was not deprived of a fair trial.

In view of the fact that the requests for these specific documents were made during the course of trial, this case is distinguishable from *People v. McCabe*. In *McCabe*, there was an "eleventh hour delivery" of materials requested well before the commencement of trial. This court found that under the facts of that case, this type of delivery was violative of defendant's due process rights and Supreme Court Rule 412. (75 Ill. App. 3d 162, 167.) In the instant case, the first request for the materials in question was made after trial had commenced.

Even if it be assumed, for purpose of discussion, that a due process issue is present here, we conclude that such possible error was harmless beyond a reasonable doubt. We note the analysis and cases cited in *People v. Collins* (1980), 85 Ill. App. 3d 1056, 1060, 407 N.E.2d 871.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.