THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FORREST MYERS, Defendant-Appellant.

First District (1st Division)    No. 78-1759

Opinion filed December 29, 1980.

Steven M. Levin and Allan A. Ackerman, both of Chicago (Bernard Brody, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Michael K. Demetrio, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

The defendant, Forrest Myers, appeals from four convictions for unlawful delivery of a controlled substance (Ill. Rev. Stat. 1975, ch. 56½, pars. 1401(b), (c), (d), (e)), for which he was sentenced to concurrent three year terms of imprisonment. The following issues are raised on appeal: (1) whether the defendant adequately raised entrapment as an affirmative defense; (2) whether the trial court erred in denying the defendant the opportunity to determine whether T. C. Cargill was an informant; (3) whether the trial court improperly restricted the scope of Agent Ferguson's cross-examination; and (4) whether the trial court erred in denying the defendant a continuance when Cargill refused to testify until he could consult with his attorney.

We affirm.

The facts reveal that the defendant was charged with making four separate deliveries of controlled substances to Agent Clem Ferguson during a two-week period commencing February 25, 1977, and terminating on March 12, 1977. The State elected to proceed to trial on the indictment pertaining to the March 12, 1977, delivery. The defendant was tried in a bench trial as to that indictment and in a stipulated bench trial as to the remaining three indictments.

The following testimony was received in the trial incident to the March 12, 1977, delivery. Agent Ferguson testified for the State that he had been employed by the Illinois Department of Law Enforcement for five years as a special agent with the Investigation Division (hereinafter Department). As to the events giving rise to the March 12, 1977, delivery, Ferguson testified that he contacted the defendant at 5:30 p.m. on March 11, 1977, and asked him if the "stuff" was in yet. The defendant responded in the negative. Ferguson explained that "stuff" meant cocaine in this instance. A second conversation between the two occurred at 8 p.m. At this time the defendant again reported to Ferguson that the "stuff" was not in yet. Ferguson testified that at this point he informed the defendant that the deal was taking too long and that he was going to leave town. The defendant requested Ferguson not to leave town because he had already given his man $6,000 to pick up the cocaine and that if Ferguson left town that he would not have a purchaser for the cocaine.

At 10:45 p.m. when the "stuff" was still not in, Ferguson began to explore the possibility with the defendant of getting some other types of drugs from him. He questioned the defendant about some Meperdine needles the defendant had previously mentioned that he had for sale. Myers told him he had approximately 400 needles at $20 per needle. Ferguson told the defendant that he had $10,500 and that, as it was taking too long to complete the deal, he would buy the Meperdine needles and whatever amount of preludin, valium and quaalude Myers could supply

to make up the difference. They agreed to meet at approximately midnight at the parking lot of a grocery store located at 87th and the Dan Ryan expressway in Chicago. Agent Ferguson arrived at that location at approximately 11:35 p.m. Shortly after midnight the defendant entered the parking lot and came over to Ferguson's car. He informed Ferguson that he had 378 needles and a variety of other substances equal to the $10,500. When Ferguson agreed to purchase these, the defendant returned to his car where he removed a brown paste box which he gave to Ferguson. At this time Ferguson gave him $10,500. Shortly thereafter, agents of the Department arrived and placed the defendant under arrest and took the money and the drugs into their custody.

During Ferguson's cross-examination, he testified that he knew that the defendant owned a pharmacy and that he had gone to the defendant's pharmacy with a man named Cargill. The State objected to this line of questioning on the ground that it went beyond the scope of direct examination. The defense made an offer of proof that Ferguson would establish that an individual named T. C. Cargill was an informant. It was further stated that it was the defense belief that Cargill set up the March 12, 1977, transaction and that Cargill supplied the drugs. It was not the defense contention, however, that Ferguson was present when Cargill gave Myers the drugs or that Ferguson gave Cargill the drugs to give to Myers. After hearing the offer of proof, the trial court ruled that the defense could not continue with this line of questioning because it went beyond the scope of direct. Upon resumption of Ferguson's cross-examination, the defense counsel asked him whether a confidential informant was used in connection with the March 12, 1977, drug transaction. Ferguson admitted that a confidential informer had been used. However, when Ferguson was asked to disclose the name of the confidential informer the court sustained a State objection to the question. The court also denied a defense motion for disclosure of the informant's identity. Ferguson was next asked whether Cargill was his informant; however, again the State objected. Defense counsel argued that this question would not violate the confidentiality of the informant because the question was not asking for a name not already known to the defendant. The trial court sustained the objection. After the admission of chain of custody testimony and the admission of several State exhibits, the State rested.

Prior to the commencement of the defense case, counsel for the defendant informed the trial court that he wished to call T. C. Cargill as a witness; however, Cargill had informed him that he would not testify until he could obtain advice from his attorney. Cargill had informed counsel that he would invoke his fifth amendment rights if called to testify now but would testify after his bail jumping charge had been resolved. It was

also represented that Evelyn Jones, Cargill's wife and an intended defense witness, would not testify until Cargill's case had been disposed of. Based on these representations, the defense requested a continuance. At this time the State's Attorney informed the trial judge that he had talked to Cargill and that Cargill told him that if he could get out of the bail jumping charge pending against him he planned to go to Minnesota. After this representation, the trial court ordered Cargill to take the stand. Cargill testified that he planned to take the fifth amendment in response to any question concerning the instant case. He also stated that he would appear in court if requested to in the future but whether he would testify would depend on advice of counsel. On cross-examination, Cargill stated that he had first talked with defense counsel the day prior to trial. Defense counsel resumed his request for a continuance. After hearing argument on the motion, the trial court denied the motion. At this juncture, the defense again called Cargill; however, when he again refused to respond to questions the trial judge ordered the witness removed from the court-room.

Forrest Myers testified in his own behalf that he was a licensed pharmacist in Illinois and owned the Bel-Aire Pharmacy located at 8501 South Cottage Grove Avenue in Chicago. He testified that he had known an individual by the name of Cargill for two years and that in May 1976 he borrowed $5,000 from him to be used in the operation of his pharmacy. This loan was to be repaid with interest in six months. Only the interest was paid in 1976. Myers testified that he did not see Cargill again until February 1977 when he appeared at Myers' pharmacy and demanded repayment of the $5,000 within four hours. When Myers informed Cargill that he could not repay the money that soon, Cargill threatened him. The next day Cargill again requested the money. When Myers again told him that he didn't have it, Cargill told him he wanted him to deliver drugs for him. Myers refused, noting that such action on his part would jeopardize his license and consequently his business. Myers also stated that Cargill instigated a course of constant intimidation making frequent calls and visits to his pharmacy. When Cargill subsequently threatened to harm not only him but also his wife and children he agreed to deliver drugs for Cargill. On cross-examination Myers testified that neither his wife nor his children were present at the time threats were made against them. Myers also admitted that Cargill did not have a gun or knife held on him at the time that the threats were made. However Myers did note that he knew that Cargill often carried a gun and had been in jail before.

The next time Myers saw Cargill was approximately the third week of February when he appeared at the pharmacy with Ferguson. This was the first time that he had met Ferguson and the only time the three men were ever together. A few days after this meeting, Cargill informed him

that he had arranged a date and location for Myers to make a delivery to Ferguson. Myers admitted delivering drugs to Ferguson on February 25, March 8, March 11, and March 12, 1977. He stressed, however, that on each occasion Cargill set up the transaction, supplied the drugs, set up the meetings, and received the money that Ferguson gave to him. Cargill was not physically present at any of the meetings. On each occasion, Myers went to the home of Cargill's mother and received the drugs from a woman in Cargill's presence. He would bring the money to Cargill after each sale. Myers' only contact with Ferguson during this period, according to his testimony, was when Cargill had Myers deliver drugs to Ferguson.

Myers next testified that on March 11, 1977, he received several phone calls from Ferguson. During the course of these conversations Ferguson asked if Myers had any cocaine for him. Myers informed him that he had no source for cocaine. Later, when Myers again told Ferguson that no cocaine was available, Ferguson told Myers that he needed to have some drugs if he couldn't supply the cocaine because he had borrowed money to buy the drugs and had to pay interest on it. At this point Myers placed Ferguson on hold and called Cargill on a second line. Cargill told him to come over to his mother's home later and that he would have some drugs for him. Myers picked up the merchandise as instructed and went to the location that both Ferguson and Cargill had told him to go to. Upon delivering the drugs and receiving a sum of money from Ferguson he was arrested at the scene.

After hearing closing argument, the trial court found that the defendant failed to raise entrapment as a defense. Specifically, the court found that Myers failed to prove that Cargill was an informant, or that Cargill was the source of the narcotics delivered to Ferguson. Thereafter, the trial court entered judgment on his finding of guilt. After the judgment in the first case, the court commenced the proceeding as to the remaining three indictments against the defendant. The defendant waived his right to a jury trial. It was thereafter stipulated that the defendant had sold to Agent Ferguson certain controlled substances on February 25, March 8, and March 11, 1977, to wit: diazepam and phenmetrazine. The stipulated evidence also included the evidence presented in the course of the original trial conducted pursuant to the March 12, 1977, delivery. Upon the conclusion of these stipulations the court entered findings and judgments of guilt for each offense charged in the three remaining indictments. Subsequently, the defendant was sentenced to concurrent three-year sentences for each of the offenses. Defendant's post-trial motion was denied on September 29, 1978. The defendant has filed a timely appeal.

Under the Illinois entrapment statute (Ill. Rev. Stat. 1977, ch. 38, par. 7—12) an entrapment defense is raised where the defendant's conduct

was induced by a government officer or employee or the agent of either with the intent of obtaining defendant's prosecution provided that the defendant had no predisposition to commit the crime so that the criminal purpose originated with the officer or his agent not with the defendant. (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812, *cert. denied* (1979), 440 U.S. 974, 59 L. Ed. 2d 792, 99 S. Ct. 1542; *People v. Dempsey* (1980), 82 Ill. App. 3d 699, 402 N.E.2d 924.) Once the entrapment defense is raised it becomes incumbent upon the State to prove beyond a reasonable doubt that entrapment did not occur. Ill. Rev. Stat. 1977, ch. 38, par. 3—2(b); *People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528; *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879; *People v. Ball* (1980), 91 Ill. App. 3d 1041, 415 N.E.2d 471; *People v. Dempsey*.

The defendant argues that his conviction was erroneous because entrapment was established as a matter of law where the State failed to introduce the informant to rebut the defendant's involvement and where the State did not question the agent as to how the transactions were arranged although this testimony also would have negated the alleged entrapment of defendant by Cargill. The State, on the other hand, argues that the trial testimony failed to raise the entrapment defense either because no evidence in fact established Cargill's informant status or because the evidence established the defendant's predisposition. Because we find from the record that the judge could have found that the defendant was predisposed to commit the offense and, therefore, could have rejected the entrapment defense despite some degree of involvement by Cargill, we find it unnecessary to entertain the State's alternative contention.

■■ Entrapment as a matter of law is not established where there is any substantial evidence from which it may be inferred that the criminal intent to commit a particular offense originated in the mind of the accused. (*People v. Tipton*; *People v. Cross*.) The supreme court in *Cross* stated that language found in *People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765, and *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879, to the effect that entrapment is established where a government informer supplies a controlled substance to an individual who is later prosecuted for its unlawful delivery was not intended to establish a per se rule of entrapment. The court pointed out that in *Strong* and *Dollen* there had been no testimony which indicated that either defendant had been predisposed to commit the alleged crime. Accordingly, the unexplained failure to call the informer gave rise to an inference against the State. The pivotal inquiry in a case where the defense of entrapment has been raised, the supreme court explained, is not whether the government may have supplied the substance but "whether the 'criminal purpose' of *selling* these substances originated with the defendants." (77 Ill. 2d 396, 404.) The court

further explained that by supplying an individual with controlled substances the government merely facilitates or provides the defendant with an opportunity to make an unlawful delivery.

In determining whether a defendant was predisposed to commit a crime, courts have looked at a variety of factors: whether a defendant was engaged in drug trafficking prior to the present incident or had otherwise engaged in criminal activity (*People v. Dollen*; *People v. Strong*; *People v. Wells* (1962), 25 Ill. 2d 146, 182 N.E.2d 689; *People v. Andreano* (1978), 64 Ill. App. 3d 551, 381 N.E.2d 783; *People v. Rogers* (1972), 6 Ill. App. 3d 1092, 286 N.E.2d 365); easily acquiesced in the request to supply drugs and had ready source to purchase drugs from (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528; *People v. Gonzales* (1962), 25 Ill. 2d 235, 184 N.E.2d 833, *cert. denied* (1963), 372 U.S. 923, 9 L. Ed. 2d 728, 83 S. Ct. 740; *People v. Wells*; *People v. Dempsey* (1980), 82 Ill. App. 3d 699, 402 N.E.2d 924); familiarity with drugs (*People v. Tipton*; *People v. Cross*); or initial reluctance or refusal to enter into a narcotics transaction. *People v. McSmith* (1961), 23 Ill. 2d 87, 178 N.E.2d 641; *People v. Washington* (1967), 81 Ill. App. 2d 162, 225 N.E.2d 673, *cert. denied* (1968), 390 U.S. 991, 19 L. Ed. 2d 1298, 88 S. Ct. 1190.

In the instant case Ferguson testified that the defendant requested him not to leave town on March 11, 1977, as he had threatened, because the defendant had already sent his man with $6,000 to purchase cocaine. Ferguson also testified that, when it became apparent that the cocaine would not arrive in time and that other drugs would have to be supplied, the defendant mentioned that he had meperdine for sale at $20 per needle. The testimony concerning the $6,000 cocaine purchase was not refuted by the defendant although if, consistent with his story, he had been told to say this by Cargill he could have explained that fact. (See *People v. Dollen*.) These facts suggest a familiarity with drugs as well as a knowledge of a supplier, factors which have been found to signal predisposition. (*People v. Tipton*; *People v. Cross*; *People v. Gonzales*; *People v. Washington*.) While the defendant had no prior criminal record, this fact in itself is not conclusive on the issue of predisposition. (*People v. Wells*; *People v. Andreano*; *People v. Cooper* (1974), 17 Ill. App. 3d 934, 208 N.E.2d 815.) Nor is the defendant's claim that he only delivered the drugs because Cargill threatened him and his family conclusive on this issue as the trial court apparently did not believe this story. *People v. Dempsey* (1980), 82 Ill. App. 3d 699, 402 N.E.2d 924.

█■ We have carefully considered the facts of the instant case because we are aware of the closeness of this issue and because we realize the serious professional impact on the defendant that our determination will have. We are mindful that a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or

the credibility of the witnesses and should not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt (*People v. Dempsey*) and that the question of whether entrapment exists is a question of fact for the factfinder. (*People v. Tipton*.) Here, although a close question was presented, we find that sufficient evidence of the defendant's predisposition was introduced to justify the trial court's finding that the defendant was not entrapped.

■■ In so concluding we note that the evidence of predisposition pertained solely to the March 12, 1977, delivery. However, as it has been held that subsequent transactions may be considered in determining predisposition (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528), we believe that the existence of the defendant's predisposition to engage in the fourth drug transaction weakens if not totally destroys his testimony that he only delivered drugs for Cargill because of his threats. Accordingly, we think that the trial court could have determined that the entrapment defense was barred as to all four charges. In light of our conclusion that the defendant's entrapment defense failed because of the existence of evidence suggesting his predisposition, we find it unnecessary to consider defendant's second argument that the trial court erred in denying the defendant the opportunity to determine whether T. C. Cargill was the confidential source involved with Ferguson in the drug transaction of March 12, 1977. Whether Cargill or some unknown third party was involved in the transaction is inconsequential where the defendant's predisposition bars the use of the entrapment defense.

The defendant's third argument is that the trial court committed reversible error when it restricted the scope of agent Ferguson's cross-examination. The latitude to be allowed in cross-examination rests in the discretion of the trial court. (*People v. Hubbard* (1973), 55 Ill. 2d 142, 302 N.E.2d 609; *People v. Agosto* (1979), 70 Ill. App. 3d 851, 388 N.E.2d 1018; *People v. Yancey* (1978), 57 Ill. App. 3d 256, 372 N.E.2d 1069.) The general rule is aptly explained by the supreme court in *Hubbard*:

> "The general rule is that the latitude to be allowed in cross-examination of witnesses rests in the discretion of the trial court. This court long ago stated that in the absence of clear abuse of that discretion, a reviewing court will not find reversible error where cross-examination might have been unduly restricted unless there was a clear abuse of this discretion, resulting in manifest prejudice." 55 Ill. 2d 142, 150-51.

■■ After reviewing the record here we find no abuse of discretion in the trial court's ruling nor prejudice to the defendant. While agent Ferguson testified on direct solely as to the activities surrounding the March 12, 1977, delivery, the line of questioning objected to by the State pertained to matters which occurred prior to March 12 and was, therefore, outside

the scope of direct examination. It is generally recognized that preventing cross-examination of matters outside the scope of direct which do not pertain to bias, motive, or interest on the part of a witness, does not abuse the discretion of the trial court nor prejudice the defendant. *People v. Agosto*; *People v. Yancey*.

██ The defendant's final argument is that the trial court erred when it refused to allow a continuance requested by the defense counsel in order to allow time for T. C. Cargill to conclude proceedings against him in another court. After hearing argument of both counsel and the testimony of Cargill, the trial court denied the motion. We find no error in this denial as it is unclear from the record whether Cargill would ever be available to testify.

For the foregoing reasons the convictions and sentences entered incident thereto by the circuit court of Cook County are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.