THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DENNIS KENDRICK *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 80-1271, 80-1305 cons.

Opinion filed February 11, 1982.

Thomas J. Royce, Ltd., of Chicago, for appellant Dennis Kendrick.

Lawrence Wolf Levin, of Chicago, for appellant Francine Zeidman.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mark E. Thompson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendants, Francine Zeidman and Dennis Kendrick, were found guilty of the offenses of delivery of a controlled substance (less than 30 grams of cocaine) (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b)), and conspiracy (Ill. Rev. Stat. 1979, ch. 38, par. 8—2). In addition, defendant Kendrick was found guilty of possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b)). Each defendant was sentenced to four years in the penitentiary and fined $2,000.

The defendants brought separate appeals which have been consolidated. On appeal, defendant Zeidman contends (1) she was not proved guilty beyond a reasonable doubt; (2) she was denied a fair trial by the State's failure to comply with discovery; and (3) the trial court erred in sentencing her to four years because the court failed to determine properly whether a sentence of probation should have been imposed. Defendant Kendrick contends (1) the trial court erred in denying his motion for severance; and (2) he was denied his right to effective assistance of counsel because of a conflict of interest.

We affirm the convictions of both defendants. We reverse the sentences imposed upon the defendants and remand with directions that a new sentencing hearing be held before a judge different from the one who imposed the sentences in this case.

BACKGROUND

Defendants' arrests and convictions were the result of an undercover operation carried out by the Illinois Department of Law Enforcement. At

the time of the alleged offenses, defendant Kendrick was a Chicago police officer and defendant Zeidman was employed by the Illinois Law Enforcement Commission as a public information officer (a non-law-enforcement position).

The principle undercover agent involved in the operation was Mark Hinchy. In August 1978, Hinchy learned from one of his sources, Thomas Buffo, that cocaine could be purchased from defendant Zeidman. Hinchy arranged a meeting with Zeidman in August 1978 to set up a purchase. Hinchy maintained intermittent contact with Zeidman for a month in an effort to purchase cocaine. Zeidman continuously informed Hinchy that she could get cocaine for him but that Hinchy would have to wait until one of her suppliers could get some. In early September 1978, Zeidman told Hinchy that she could get him one-half ounce of cocaine. Zeidman also told Hinchy that her supplier was a police officer.

On September 9, 1978, Hinchy telephoned Zeidman and set up the purchase for that night. By this time, Hinchy had learned that the supplier was a police officer named Hendrick or Kendrick who drove a silver Corvette. Zeidman and Hinchy made arrangements to make the purchase in the early morning hours of September 10, 1978. Zeidman told Hinchy that the purchase would have to be made at that time because her police officer supplier worked the afternoon shift and could not bring the cocaine until after midnight.

The significant events leading up to the purchase of cocaine and the arrests of defendants were as follows. Shortly after midnight, Hinchy went to Zeidman's apartment in a high-rise building on Dearborn Street and gave her an envelope containing $1,350 in marked bills. Zeidman told Hinchy to call her at 2:15 a.m., when she would verify that the cocaine had arrived. Hinchy left and informed several agents who were on surveillance outside the apartment building that he had given Zeidman the money and the supplier would arrive shortly.

At approximately 1:15 a.m., the surveillance agents saw defendant Kendrick park his silver Corvette in front of the apartment building. Kendrick went inside the lobby for a few minutes and then returned to his car. Shortly thereafter, Zeidman and an unidentified woman came out of the lobby and went to the driver's side of Kendrick's car. Most of the surveillance agents were not in a position to see whether anything changed hands between Zeidman and Kendrick; however, one of them was close enough to see Zeidman reach toward the driver's window. This agent could not verify that anything changed hands. Thereafter, Zeidman and the unidentified woman returned to the apartment building. Kendrick drove away.

At 2:15 a.m., Hinchy telephoned Zeidman. She told him the cocaine would be there in five minutes and Hinchy was to pick it up in 20 minutes.

At approximately the same time, the surveillance agents saw Kendrick park his Corvette behind the apartment building. Kendrick went into the back of the building and was gone for several minutes before returning to his Corvette and departing. Some of the agents followed him.

At 2:35 a.m., Hinchy arrived at Zeidman's apartment. She showed him the cocaine, which was tucked into a folded piece of paper inside a plastic bag. Hinchy asked for and received permission from Zeidman to use the bathroom. Once inside the bathroom, Hinchy pressed a button on a communication device which signaled to the agents outside that it was time to make an arrest. Hinchy came out of the bathroom and asked Zeidman if she had anything to weigh the cocaine. She said she only had a kitchen scale, and pointed it out to Hinchy. At this time, two agents knocked on the door and announced that they were police officers. Zeidman told Hinchy to get rid of the cocaine. The two agents entered, at which time Hinchy told Zeidman that he was a police officer. Zeidman was arrested, and Hinchy confiscated the cocaine and the scale as evidence.

Thereafter, the agents following Kendrick were told to make an arrest. Kendrick's car was stopped and he was arrested. Kendrick and his car were searched. No cocaine and none of the marked money was found in the search. None of the money was ever recovered.

Besides the above evidence, which was testified to at trial by the agents, an expert also testified that the substance confiscated was cocaine. The expert also said that he found a fingerprint which matched Kendrick's on the piece of paper in which the cocaine had been wrapped. Other evidence showed that Kendrick had been working the 4 p.m. to midnight shift as a Chicago police officer on September 9, 1978. Telephone company records were admitted to show that, on many of the dates Hinchy had contacted Zeidman to arrange a purchase, calls were made from Zeidman's apartment to telephone numbers at two addresses, both registered in Kendrick's name.

Defendant Zeidman did not testify on her own behalf. Defendant Kendrick testified that he had known Zeidman socially for a long time and had gone to Zeidman's place on the day of the purchase because she had invited him to a party. When he arrived the first time and talked to Zeidman outside the building, she told him no one had yet arrived for the party and he should return later. When he returned the second time, he tried to contact Zeidman from the lobby but received no answer, so he left. Kendrick denied ever selling or using cocaine, and denied ever seeing Zeidman using or selling cocaine. He said he had talked to Zeidman on the phone many times before his arrest, but the calls were all social.

The jury found both defendants guilty of delivery of a controlled substance and conspiracy, and found Kendrick guilty of possession of a

controlled substance with intent to deliver (defendant Zeidman had not been charged with this offense). The trial court sentenced both defendants to four years in the penitentiary and fined defendants $2,000 each.

OPINION

I

## Defendant Kendrick

Defendant Kendrick alleges his pretrial motion for severance was improperly denied and he was denied the effective assistance of counsel because of his attorney's conflict of interest. We will discuss these issues separately.

### Severance

In a pretrial motion, Kendrick sought to be tried separately from his codefendant. Kendrick alleged he would be prejudiced by a joint trial because certain hearsay evidence that allegedly was admissible against Zeidman only (Zeidman's repeated statements to Hinchy that her supplier was a police officer) would be used against him by the jury even if a limiting instruction were given. The court denied the motion, stating it believed a limiting instruction would be sufficient to protect Kendrick's rights. At trial, Hinchy testified that Zeidman had told him many times during the course of this undercover operation that her supplier was a police officer. The court instructed the jury that this evidence was to be used by the jury only in its consideration of Zeidman's culpability for the crimes alleged.

On appeal, Kendrick cited *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, alleging that the admission of Zeidman's statements at trial denied Kendrick his right of confrontation (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8), and thus the motion for severance should have been granted to prevent the violation that occurred.

The problem with Kendrick's argument is his assumption that Zeidman's statements were inadmissible as evidence against him. In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court held that a codefendant's confession inculpating the defendant as a perpetrator of a crime was inadmissible as evidence against the defendant unless defendant could subject his codefendant to cross-examination at trial. The court held that the lack of such an opportunity to cross-examine the codefendant violated defendant's right of confrontation. The court went on to hold that giving a limiting

instruction could not cure the violation of defendant's right because it must be presumed that the jury used the evidence in determining defendant's guilt.

The present case does not concern the use of a codefendant's confession against defendant. It concerns statements made by a co-conspirator in the course and furtherance of the conspiracy. At least until 1980, such hearsay statements always were considered to be admissible against a defendant despite his inability to cross-examine his co-conspirator as long as other evidence of the conspiracy was presented. (*People v. Thomas* (1976), 38 Ill. App. 3d 689, 348 N.E.2d 285.) It was also the rule that the *Bruton* analysis did not apply to such statements. (*People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140.) Kendrick does not deny that other evidence of the conspiracy was presented in this case. The fingerprint evidence, Kendrick's presence at the scene of the alleged offense, and the phone calls made between Zeidman's phone number and his phone numbers on the days Hinchy contacted Zeidman during the undercover operation were sufficient other evidence to allow Zeidman's statements to be used as evidence against Kendrick.

On June 25, 1980, the Supreme Court decided *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, which fundamentally changed the manner in which any hearsay statement used to prove the truth of the matter asserted can be used against a defendant without violating his right of confrontation. In *Roberts* the court set out two rules affecting the admissiblity of all hearsay used against a defendant: (1) in the usual case, hearsay is admissible against the accused only if the State produces the declarant so he can be subjected to cross-examination at trial, or, if not produced, the State has made an initial showing that the declarant is unavailable to testify; and (2) if the declarant is not available for cross-examination at trial, the hearsay declaration is admissible only if it bears adequate "indicia of reliability." As to the second requirement, the court said that "indicia of reliability" could be presumed if the hearsay declaration falls within a firmly established exception to the hearsay rule. The statements in the present case obviously met the second requirement.

■■ As to the first requirement, this court held in *People v. Hines* (1981), 94 Ill. App. 3d 1041, 419 N.E.2d 420, that a showing of unavailability in areas in which it had not been required before *Roberts* was intended by the Supreme Court to have prospective application only. Since the trial in the present case took place in 1979, and since before *Roberts* statements by a co-conspirator made in the course and furtherance of the conspiracy were admissible without a showing of unavailability, Zeidman's statements were admissible as evidence against Kendrick. Since Zeidman's statements were admissible as evidence against Kendrick, the basis for his

motion for severance did not exist. The motion was properly denied simply because the evidence was admissible against him. He was not entitled to a severance based on an allegation that admissible evidence would be used against him. (See *People v. Davis* (1970), 46 Ill. 2d 554, 264 N.E.2d 140.) We note that before the case went to the jury, the trial court rescinded its previous limiting instruction concerning the evidence and allowed the jury to consider Zeidman's statements as evidence against Kendrick. This ruling was proper, as was its ruling denying Kendrick's motion for severance.

## Conflict of Interest

At the beginning of the proceedings in this case, both defendants were represented by one attorney. Following the denial of Kendrick's motion for severance, the court was informed that the first attorney would thereafter be representing Zeidman and that a second attorney would handle Kendrick's defense. This second attorney was introduced to the court, the court allowed him to take over Kendrick's defense, and he conducted Kendrick's defense throughout the trial. In a post-trial motion seeking a new trial based on the ineffectiveness of Kendrick's counsel, the court was informed for the first time that Kendrick's attorney was an associate working for Zeidman's attorney. On appeal, Kendrick alleges that because of this conflict of interest he should be entitled to a new trial.

■■ In cases such as the present one, though defendant need not show he was prejudiced by a conflict of interest concerning his attorney, he must show that an actual conflict of interest existed before he can be entitled to a new trial. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63.) In other words, a defendant must show that his attorney actively represented competing interests at the time of trial. *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708.

Nothing in the record indicates that Kendrick's attorney actively represented competing interests at trial. Kendrick contends that the two defendants' defenses conflicted, but does not state how they conflicted. The defenses of both defendants were essentially the same. Both simply denied they had committed a crime and based their case on the ability or inability of the State to prove them guilty beyond a reasonable doubt.

■■ Kendrick contends that an abundance of evidence was presented to the jury which shows an obvious conflict, but does not point to any evidence that supports this claim. The crux of Kendrick's argument is that, simply because both attorneys were from the same law firm and that firm represented both defendants at trial, we automatically should conclude an actual conflict of interest existed. This argument is insufficient to prove

such a conflict. See *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63.

Thus, we find that Kendrick's argument is without merit.

## II

### *Defendant Zeidman*

Defendant Zeidman raises three isues on appeal: (1) she was not proved guilty beyond a reasonable doubt; (2) she was denied a fair trial by the State's failure to comply with discovery; and (3) the trial court erred in sentencing her to four years.

### *Reasonable Doubt*

Zeidman claims she was not proved guilty beyond a reasonable doubt of the offenses of delivery of a controlled substance or conspiracy.

The evidence on both offenses was overwhelming. The testimony of the agents conclusively established the offense of delivery of a controlled substance. Zeidman points to minor discrepancies in some of the agents' testimony and alleges these discrepancies prove the agents' testimony was inherently incredible. One of these discrepancies is that one of the arresting agents could not remember whether she saw the cocaine on the scale, on the kitchen counter, or on the kitchen table when she entered the apartment to make the arrest. Another discrepancy pointed out by Zeidman is that the two agents who knocked on the door to effect an arrest each testified that it was the other who announced that they were police officers. Obviously, these discrepancies do not give rise to an inference that the overall testimony of the agents was inherently incredible.

The evidence also proved the offense of conspiracy. Essentially, Zeidman argues that no one actually saw Kendrick deliver the cocaine to Zeidman and thus there was no proof of conspiracy. Zeidman's argument ignores all the other evidence in the record. Zeidman repeatedly told Hinchy that her supplier for cocaine was a police officer. Kendrick's fingerprint was found on the paper containing the cocaine. Zeidman met Kendrick on the night of the purchase. Telephone calls were frequently made between Zeidman's phone and Kendrick's phones on the days Hinchy contacted Zeidman seeking cocaine. Though no one actually saw or heard Zeidman and Kendrick agree to commit an offense, this was not necessary to prove conspiracy. *People v. Graham* (1971), 1 Ill. App. 3d 749, 274 N.E.2d 370.

Accordingly, we find that Zeidman was proved guilty beyond a reasonable doubt of the offenses of delivery of a controlled substance and conspiracy.

*Discovery*

At trial, Kendrick's fingerprint card taken after his arrest was introduced as evidence both to prove Kendrick committed the crimes alleged and to prove Zeidman's involvement in a conspiracy. Also introduced was the scale found in Zeidman's apartment. Zeidman contends the admission of this evidence was error because the State did not produce this evidence during discovery.

■■ As to the fingerprint card, Zeidman and Kendrick made a pretrial motion to suppress it as evidence at trial, which motion was denied. Thus, Zeidman knew it was going to be introduced as evidence at trial. The objection at trial was that the card should not be introduced as evidence because the State had failed to give defendants a photostatic copy of the card before trial. Discovery rules are designed to prevent surprise and unfair advantage. (*People v. Goodman* (1977), 55 Ill. App. 3d 294, 371 N.E.2d 168.) Even if we were to assume that there may have been a technical failure to produce the card for defendants before trial, Zeidman's attorney had an opportunity to examine the card when the pretrial motion was made, and Zeidman could hardly allege any surprise or unfair advantage when the card was introduced as evidence at trial.

As to the scale, though it was not produced before trial, we cannot see how Zeidman was prejudiced by its introduction at trial. Its evidentiary value was minimal, and even if it had been suppressed the outcome of the trial would have been the same.

Thus, we find that Zeidman's contention is without merit.

*Sentencing*

The offenses committed by defendants were Class 2 felonies. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b).) They were the first offenses for which either of the parties had ever been arrested. At the time of the sentencing hearing, both defendants were employed at different jobs from the ones which they held at the time the offenses were committed.

Besides the above factors, other factors in mitigation were argued before the trial court. The offenses did not threaten any serious physical harm to another. Defendant Kendrick had three children who relied on him for support. Defendant Zeidman had medical problems that required a doctor's care. Counsel for defendants indicated that the defendants were willing to accept a fine so that the money lost by the State could be recovered.

In aggravation, the State argued that the crimes committed were very serious and that Kendrick, as a police officer, had breached his duty to prevent crime.

After hearing this evidence, the court imposed sentences of four

years and fines of $2,000 on both defendants. The issue presented here is whether the court properly considered probation as a possible sentence.

Under section 5—6—1 of the Unified Code of Corrections, "[e]xcept where specifically prohibited by other provisions of this Code, the court shall impose a sentence of probation or conditional discharge upon an offender unless, having regard to the nature and circumstances of the offense, and to the history, character and condition of the offender, the court is of the opinion that: (1) his imprisonment or periodic imprisonment is necessary for the protection of the public; or (2) probation or conditional discharge would deprecate the seriousness of the offender's conduct and would be inconsistent with the ends of justice." Ill. Rev. Stat. 1979, ch. 38, par. 1005—6—1.

After hearing the evidence in mitigation and aggravation, the trial court imposed sentence on the defendants. The transcript of the trial court's remarks in doing so indicates that the trial court ignored even the possibility of probation for either defendant. The court admitted that rehabilitation was not a factor in the case because both defendants could obviously comply with the law after their convictions. However, the trial court stated that what he had before him was a "kinky cop" and two people from excellent backgrounds. The trial court stated it could not give the parties probation "any more * * * than the man on the moon." essentially because "[i]f they were people from the ghetto they would be talking about hanging them." The trial court said that it saw no difference between the defendants and implied that Zeidman, simply because she had worked for the Illinois Law Enforcement Commission in a non-law-enforcement position, had the same duty as Kendrick to prevent crime. Finally the trial court stated, in effect, that it had to impose a long sentence on both defendants to send a message to everyone that people like defendants should always go to jail.

It is apparent from the trial court's remarks that the court was predisposed to giving the defendants prison terms even before the sentencing hearing began, and that the trial court failed to consider even the possibility of probation as required by law. Nothing in the trial court's remarks indicates that it considered whether imprisonment was necessary for the protection of the public, or whether probation would be inconsistent with the ends of justice. See *People v. MacRae* (1977), 47 Ill. App. 3d 302, 361 N.E.2d 685, and subsequent opinion following remand, *People v. MacRae* (1979), 78 Ill. App. 3d 266, 397 N.E.2d 509.

■■ Though defendant Zeidman is the only party who has challenged the sentence in this case, the error in sentencing defendant Kendrick is just as plain. Accordingly, we reverse the sentences imposed on both defendants and remand with directions that a new sentencing hearing be held before

a judge different from the one who imposed the sentences in this case. See *People v. Cross* (1975), 27 Ill. App. 3d 785, 327 N.E.2d 81.

For the reasons noted, the convictions of both defendants are affirmed; their sentences are reversed and the cause remanded with directions.

Affirmed in part, reversed in part, and remanded.

JOHNSON, P. J., and JIGANTI, J., concur.