THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEON ROBERT NORKS, Defendant-Appellant.

Second District   No. 2—84—1137

Opinion filed October 23, 1985.

NASH, P.J., dissenting.

G. Joseph Weller and Robert Hirschhorn, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Leon Robert Norks, was convicted after a bench trial in the circuit court of Kane County of the offense of unlawful delivery of 0.2 grams of cocaine (Ill. Rev. Stat. 1983, ch. 56½, par. 1401(c)), and the trial court sentenced him to three years' imprisonment.

The defendant raises four issues in this appeal: (1) whether the defendant was entrapped; (2) whether the outrageous conduct of the police amounted to a violation of due process of law; (3) whether the defendant was prejudiced by the State's violation of discovery orders; and (4) whether the legal representative of the defendant was hindered by an actual conflict of interest.

We resolve all of these issues against the defendant and affirm the judgment of conviction entered below.

Detective Robert Wochner of the Batavia police department testified that on April 10, 1984, he was working in street clothes as an undercover investigator.

He drove a yellow Trans Am to the Pride Gas Station at Route 25 and Fabyan Parkway in Kane County. Three or four minutes after he arrived at the gas station, a station wagon arrived with two occupants who parked and got out. Detective Wochner knew one as Mike Mason, who introduced him to the other person who was the defendant, Leon Norks. The three then got into the station wagon at the suggestion of the defendant. The defendant handed Detective Wochner a small brown bottle which contained white crystalline powder. Wochner asked, "How much?" The defendant stated, "Fifty Dollars, right?" Wochner then counted out $50 and handed it to the defendant, who counted it and put it in his pants pocket.

Detective Wochner performed a field test on the substance found in the bottle and it turned pink. A Du Page County sheriff's office forensic chemist testified the material found in the bottle was 0.2 grams of "L" cocaine, a controlled substance.

The wife, Mary Jo Norks, testified that on April 10, 1984, at about 5 o'clock p.m., Mike Mason came to the Norks' house at 430 North River Street, Aurora. Both Norks and Mason were in the kitchen when Mason took a bottle of cocaine out of his pocket and placed it on the kitchen table. She related that Mason asked Leon if Leon knew where they could sell the cocaine and Mason said he could

not sell it because he owed some guys some money, so he found Leon so that he would do it for him. Mason also asked the Norks if they wanted to use some of the cocaine but they declined. Mrs. Norks did not see her husband handle the cocaine bottle. Mason and Leon Norks left the Norks' home a half hour after Mason had arrived.

Detective Robert Wochner, at the request of the defendant, was called as a court's witness. He testified that on April 10, 1984, he was called on the phone at the police department at 4:30 by Mike Mason. Mason indicated that he had an individual who wanted to sell one-half gram of cocaine for $50. Wochner arranged with Mason for the transaction to take place at the Pride Gas Station in Batavia at 6 o'clock p.m. Mason informed Wochner that the person selling the cocaine would be Leon Norks. Wochner knew at this time that Mason was acting as a confidential informant for the police department of Batavia, but he was unaware of any deal that may have been struck with Mason but knew he had pending charges.

The parties then entered into a stipulation as to the testimony of Officer Bainer of the Batavia police department if he were called as a witness, which was:

"Officer Bainer would testify that he was involved in the arrest of Michael Mason on March 28, 1984, for possession of cannabis and theft. That shortly after his arrest on these charges, he had a conversation with Mr. Mason, wherein, he indicated to Mr. Mason that if Mr. Mason would participate with the police in setting up three deliveries of a controlled substance that it would be his recommendation to the State's Attorney's Office of Kane County they would recommend sentence be imposed that does not require imprisonment or jail time. With that understanding, Mr. Mason agreed to cooperate with the police in attempting to set up three deliveries of controlled substances. That conversation took place sometime in late March 1984."

The defendant, Leon Norks, testified in his own behalf. He stated that Michael Mason, whom he had known for two or three years, came to his house on April 10, 1984, at 5 p.m. Mason and he talked for about a half hour. Mason told Norks he had some cocaine that he wanted to sell. Mason showed him a vial of cocaine. Mason asked Norks if he knew anywhere he could sell it. Norks said, "Man, I can't. I got no connections like that." Mason then proposed that Norks sell the cocaine to a person named Bob for $50 and that they split the proceeds. At first Norks refused, but Mason kept pushing the issue. Finally, Norks agreed to do it. They left the Norks' apartment, and the transaction went off as Detective Wochner stated it.

The defendant contends his conviction must be reversed because the State failed to prove beyond a reasonable doubt that entrapment did not occur. Specifically, he asserts the trial judge confused his willingness to commit the crime with his predisposition to commit it. He argues a showing that he was willing to commit the crime is not enough to overcome the defense of entrapment, citing in support *People v. Pates* (1980), 80 Ill. App. 3d 1062, *aff'd* (1981), 84 Ill. 2d 82. The defendant further argues that his entrapment defense must prevail unless it is shown that it was he who originated the criminal purpose. That is, the defendant asserts that the State must prove that he originated the criminal purpose as well as prove that he was willing to commit the crime.

■ It is true as defendant argues that the mere showing that he "willingly" committed the crime charged does not defeat his defense of entrapment. However, a demonstration that he was willing to commit it in furtherance of a criminal purpose which he originated is enough to overcome the defense. (*People v. Pates* (1980), 80 Ill. App. 3d 1062, 1064, *aff'd* (1981), 84 Ill. 2d 82.) In *Pates*, the court considered the propriety of an instruction which stated, in essence, that no entrapment of the defendant could be said to have occurred if the defendant was simply offered the opportunity or facility for committing a crime which he was willing to commit. In rejecting that instruction as an inept reflection of the law, the court pointed out that if such were the case, the defense of entrapment would be virtually unavailable in narcotics delivery cases, since the defendant's intent to deliver the substance in question could not be shown without a simultaneous showing of some degree of willfulness. "The question is not whether the defendant intended to commit the crime, but whether the intent originated in his mind." (*People v. Pates* (1980), 80 Ill. App. 3d 1062, 1066, *aff'd* (1981), 84 Ill. 2d 82.) "[T]he critical inquiry is whether the 'criminal purpose' of *selling* [the substance] originated with the [defendant] [citation]." (*People v. Cross* (1979), 77 Ill. 2d 396, 404, *cert. denied* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316.) In determining whether the defendant originated the criminal purpose, the defendant's predisposition and the governmental involvement should be considered. *People v. Dempsey* (1980), 82 Ill. App. 3d 699, 701; *People v. Cross* (1979), 77 Ill. 2d 396, 405, *cert. denied* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316.

■ It is axiomatic, however, that it is not the trial court's reasoning which is the subject of this court's review, but, rather, its judgment. The issue of whether a defendant has been unlawfully entrapped is a factual question for the trier of fact (*People v. Gresham*

(1981), 96 Ill. App. 3d 581), and the determination of whether the defendant was predisposed to commit the offense rests upon the facts of each case. (*People v. Ball* (1980), 91 Ill. App. 3d 1041.) In this case, the trial judge was the trier of fact, and once the entrapment defense was raised, it became incumbent upon the State to prove beyond a reasonable doubt that entrapment did not occur. (*People v. Dollen* (1972), 53 Ill. 2d 280, 284.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and should not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. *People v. Myers* (1980), 92 Ill. App. 3d 229, 235-36; *People v. Dempsey* (1980), 82 Ill. App. 3d 699, 703.

■■ Sufficient evidence was introduced to justify the trial court's finding that the defendant was not entrapped.

Entrapment is an affirmative defense if established by the evidence. (*People v. Fisher* (1979), 74 Ill. App. 3d 330; Ill. Rev. Stat. 1983, ch. 38, par. 7—14.) Section 7—12 of the Criminal Code of 1961 defines the defense:

> "Sec. 7—12. Entrapment. A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." Ill. Rev. Stat. 1983, ch. 38, par. 7—12.

To establish the affirmative defense of entrapment, the evidence must disclose improper inducement on the part of the government and a lack of predisposition to commit crime on the part of the defendant. (*People v. Cross* (1978), 63 Ill. App. 3d 628, *rev'd on other grounds* (1979), 77 Ill. 2d 396, *cert. denied*, (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316.) "[T]he government must, for the purpose of obtaining evidence, originate the crime and induce the defendant to commit it; and the defendant must be an 'innocent' person who would not have committed the crime had he not been induced." *People v. Johnson* (1984), 123 Ill. App. 3d 363, 369.

In *People v. Myers* (1980), 92 Ill. App. 3d 229, 235, it was stated:

> "In determining whether a defendant was predisposed to commit a crime, courts have looked at a variety of factors: whether a defendant was engaged in drug trafficking prior to the present incident or had otherwise engaged in criminal activ-

ity [citations]; easily acquiesced in the request to supply drugs and had ready source to purchase drugs from [citations]; familiarity with drugs [citations]; or initial reluctance or refusal to enter into a narcotics transaction. [Citations.]"

Some additional factors found to be indicative of a defendant's predisposition appear in *People v. Husted* (1981), 97 Ill. App. 3d 160, 170-01; to-wit: the defendant's willingness to make a profit from the illegal act, his one-two-three times-per-month use of marijuana, his participation in the cocaine testing ritual, and his "cutting" of the cocaine with baking soda to increase the quantity from one to two ounces thereby justifying a higher price. In *People v. Dennis* (1981), 94 Ill. App. 3d 448, 453, the defendant's "ready response" to the alleged inducement and the defendant's initiation of the final transaction were viewed as showing a propensity to commit the offense. The defendant there agreed to supply the cocaine after intermittent contacts by the informant over the course of only three days' time seeking to know if the defendant knew a source for cocaine, because the informant had a friend who had $4,000 to $6,000 to buy cocaine. Defendant there stated that he made the delivery because he was promised $1,000.

A review of the evidence presented in the case at bar establishes this defendant was predisposed to commit the offense. As the State points out, the evidence shows the defendant was not induced to commit the crime, but was predisposed to commit it.

Although defendant argues he was induced to sell the cocaine because the informant, Mason, kept "going on and on" and "pushing the issue," the record shows he testified as follows regarding his initial reaction to Mason's inquiry:

"A [The defendant]: [Mason] told me: Look, I've got this cocaine, and I'd like to sell it. And do you know anywhere I could sell it. And I told him: Man, I can't. I got no connections like that."

Mason then asked to use the phone. Afterward, he proposed that the defendant sell the cocaine to a person to whom Mason was indebted. This plan was to avoid having Mason's creditor just deduct the value of the cocaine from the $100 Mason owed him. This same ruse was used by the informant in *People v. Marshall* (1981), 101 Ill. App. 3d 244, 246, a case in which the defendant was found to have predisposition. The defendant in that case had finally agreed to sell the cocaine as a "favor" to the informer, a person whom he had known since childhood and whom he trusted. The court there considered that perhaps one such sale could have resulted from the in-

former's coaxing, but the defendant made deliveries on three separate occasions several days apart. This indicated to the court the defendant's desire to become involved in the trade and a deliberate intent to do so. Unlike this case, however, it does not appear the defendant in *Marshall* had any history or knowledge of drug use, or that he received any money from the informer in return for the "favor."

The deal arranged here between Mason and the defendant was that they would split the $50 received for the cocaine from the buyer. Defendant testified Mason kept "pushing" him on for 15 or 20 minutes: " 'Come on, Leon, do this. I've known you for a long time.' I thought, what the hell. *** I'll do it."

Defendant testified he was willing to do it because he was going to make some money. He testified he did not kick the "inducer" out of the apartment when he made the suggestion concerning the cocaine; rather, he negotiated with him for about 15 minutes. Defendant testified: "When [Mason] first brought it to me, I said: 'Look, why the hell should I do something for nothing?' " He testified he knew it was illegal to sell the cocaine, but since Mason was a friend, he decided he would go ahead and "do a favor." He testified that no threats were made, and he admitted that all Mason did was give him an opportunity to make some money.

Contrary to the defendant's assertion, the evidence does not show he did not want to sell the cocaine until Mason "finally talked him into it." Rather, he stated he "couldn't" sell it because he did not have "any connections like that." When such a connection was supplied and a profit incentive added, the defendant decided he could do this "favor." The defendant testified he had used marijuana prior to his marriage, and stated he "assumed" that the drug contained in the small vial produced by the informant was cocaine because, according to him: "I've been around. I know."

The defendant named two of his friends who used cocaine; he had seen them "dealing up around West High." He had seen them possessing or using drugs other than cocaine, such as "reefer [marijuana] or heroine [sic]." He testified he did not buy marijuana in the past, but he had brothers who used it and who gave him some without charge. As to their sources, the defendant stated: "there is [sic] fifty million in Aurora you can buy reefers from." He testified to his knowledge of the various means of ingesting cocaine, and to the various substances used to "cut" cocaine. The State's evidence also showed the defendant offered to set up a second sale for the buyer in case he "liked" this delivery of cocaine.

In sum, the evidence showed the defendant was familiar with the

drug milieu, and that he was predisposed to make the delivery. When the informant offered him the opportunity to commit the offense by supplying the drug, the buyer, and a promise of a profit, the defendant readily responded. Consequently, the trial court's judgment is justified by the evidence and no reversal is warranted.

The defendant next contends that, notwithstanding his predisposition, his conviction should be reversed because the police conduct here was so outrageous as to amount to a violation of due process of law. He points to this court's decision in *People v. Johnson* (1984), 123 Ill. App. 3d 363, as a case "in which the validity of this defense was recognized."

■ The State contends that the defendant has waived this issue for failing to include it in his post-trial motion. The defendant urges that the issue be considered under the plain error doctrine, however, since the issue "was certainly implicit in the entrapment defense which was asserted." No such implication is possible, though, since the "outrageous governmental conduct" defense was recognized in *Johnson* as a separate defense from that of entrapment. (*People v. Johnson* (1984), 123 Ill. App. 3d 363, 370; see also *People ex rel. Difanis v. Boston* (1981), 92 Ill. App. 3d 962, 964-67.) Defendant's further argument that the issue should not be waived due to ineffective assistance of counsel at trial is without merit, first, because that issue in this context is presented for the first time on appeal, and second, because defendant failed to offer any argument or authority in support of it. Accordingly, the issue is waived.

■ Moreover, even if the issue were considered on its merits assuming *ad arguendo* the validity of the defense, the circumstances of this case do not present a picture of government conduct which is "so overreaching as to bar prosecution of the defendant as a matter of due process of law." That conclusion was reached in *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373, one of the first and one of the few cases in which a conviction was reversed based on the outrageous governmental conduct defense.

In *Twigg*, the nominal defendant was convicted of the manufacture of a controlled substance, methamphetamine hydrochloride, commonly known as "speed." His codefendant, Neville, was convicted of that offense, plus four other related offenses. Neville was the initial contact of the informant, Kubica, which contact was made at the request of the government. It appears that Neville and Kubica had apparently operated a speed laboratory together several years earlier; Twigg was then drawn into the operation by Neville, because he owed a debt to Neville. Twigg's involvement in the offense was minimal;

Neville assumed primary responsibility for raising capital and arrangement for distribution of the product. The informant, Kubica, undertook the acquisition of the necessary equipment, raw materials, and the production site, and was completely in charge of the entire laboratory. Any production assistance provided by Neville and Twigg was minor and at the specific direction of Kubica.

The outrageous government conduct which the *Twigg* court found it could not countenance by reason of fundamental fairness was that of the DEA agents who had requested the initial contact of Neville be made by the informant, Kubica. After that contact was made, the court's opinion details what the extent of the DEA's involvement was:

> "The Government proved to be of considerable assistance to Kubica in carrying out his part of the operation. DEA agents supplied him with two and one-half gallons of phenyl-2-propanone—a chemical essential to the manufacture of speed and the most difficult of the ingredients to obtain. The cost to the Government was $475.00, although the chemical could retail for twice as much. The DEA provided Kubica with about 20 percent of the glassware needed and a rented farmhouse in New Jersey in which to set up the laboratory. In addition, the DEA officials made arrangements with chemical supply houses to facilitate the purchase of the balance of the materials by Kubica under the business name of 'Chem Kleen.' Kubica personally bought all of the supplies (with the exception of one separatory funnel) with approximately $1500.00 supplied by Neville."
> *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373, 375-76.

The *Twigg* court concluded that fundamental fairness would not permit them to countenance such actions by law enforcement officials, and prosecution for a crime so fomented by them will be barred. 588 F.2d 373, 381.

In marked contrast here, there was no such government assistance provided to Mason; the police here did not pinpoint the defendant as a potential contact, and they supplied nothing in the way of assistance to Mason save for providing the buyer for the cocaine. Clearly there is no parallel between the government conduct in this case and that which was eschewed in *Twigg*.

Defendant's argument is that it was the very lack of police direction of Mason which warrants reversal. He contends it was the unsupervised police use of an informant of unsavory character through offers of leniency which was so outrageous as to amount to a violation of due process of law. The court in *United States v. Myers* (2d Cir. 1982), 692 F.2d 823, acknowledged:

"The use of dishonest and deceitful informants like [self-described con man Melvin] Weinberg creates risks to which the attention of juries must be forcefully called, but the Due Process Clause does not forbid their employment, detail their supervision, nor specify their compensation." 692 F.2d 823, 846.

The *Myers* court also fund there was no special constitutional rule which required that a person be the subject of prior suspicion of criminal activity before that person may be confronted with a governmentally created opportunity to commit a crime. (692 F.2d 823, 835.) Consequently, the fact that the informant here was not specifically directed to contact the defendant, but was—in the words of the trial court—"merely set loose in the community, much like a loose cannon," does not amount to an affront to a constitutional right of the defendant. The best defense provided such "non-suspicious" individuals is the traditional defense of entrapment. (692 F.2d 823, 835.) That defense is not established though simply because, as here, the defendant is caught by the ruse.

The conduct of the police in this case was not so outrageous as to fall within the "outrageous government conduct" defense as discussed in *United States v. Twigg* (3d Cir. 1978), 588 F.2d 373, and recognized in, but likewise rejected under the facts of, *People v. Johnson* (1984), 123 Ill. App. 3d 363.

■ The defendant next argues it was error for the court to find harmless the State's failure to (1) provide information concerning Mason's use as a confidential informant by the Aurora police department, and (2) its failure to provide the defense with a summary of Mason's oral statements made in an interview of him by an assistant State's Attorney the day before trial. Defendant asserts the court's finding of harmlessness was affected by its "misunderstanding of the legal meaning of the term predisposition," and that had the defense counsel been provided full discovery regarding Mason, "he would have called Mason as a defense witness."

The State counters that no discovery violation occurred and no new trial is warranted. We agree.

The content of the assistant State's Attorney's oral interview with Mason the day before trial was not subject to disclosure. The entitlement to a written summary of same claimed by the defendant under the authority of *People v. Szabo* (1983), 94 Ill. 2d 327, clearly does not extend to oral statements of persons the prosecution does not plan to call as its witnesses. Instances in which memoranda summarizing oral statements which must be disclosed to the defendant by the prosecution are codified in Supreme Court Rule 412(a)(i), and are lim-

ited to only those persons whom the State intends to call as witnesses. (87 Ill. 2d R. 412(a)(i).) Mason was not listed as a potential State witness, the prosecutor specifically stated he did not intend to call Mason as a witness and, in fact, Mason was not called at trial. Thus, no discovery violation may be said to have occurred.

■ Likewise, no discovery violation warranting a new trial occurred with regard to the failure of the State to provide the defendant with "all information as to the use of Michael Mason as a confidential informant in other cases besides the case involved here." As the State points out, defense counsel was aware prior to trial that Mason had a connection with the Aurora police department, yet chose not to pursue it either with Mason, who clearly was available to be interviewed by the defendant prior to trial, or with the Aurora police department.

Claimed error from nondisclosure of information which is already possessed by the defendant has been found nonprejudicial and insufficient to warrant a new trial. (*People v. Bouska* (1983), 118 Ill. App. 3d 595, 600-01; *People v. Mitchell* (1979), 68 Ill. App. 3d 370.) Further, as the State argues, the defendant's request was so ambiguous and nonspecific as to negative any possible finding of fault on the part of the prosecutor for failing to supply it.

Ostensibly, the defendant's motion for disclosure of this material was based on Supreme Court Rule 412(c), the Illinois codification of the principle enunciated in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. (87 Ill. 2d R. 412(c).) It has been held, though, that in determining whether the alleged error violated the defendant's constitutional right to disclosure, it is necessary to consider first the nature of the defendant's request. When the request is general, as it was here, there is constitutional error only if the omitted evidence creates a reasonable doubt of the defendant's guilt which did not otherwise exist. (*United States v. Agurs* (1976), 427 U.S. 97, 108, 49 L. Ed. 2d 342, 352, 96 S. Ct. 2392, 2399; *People v. Bouska* (1983), 118 Ill. App. 3d 595, 599.) The mere possibility that an item of undisclosed information might have aided the defense or might have affected the outcome of the trial does not establish the materiality of the evidence in the constitutional sense. *People v. Bouska* (1983), 118 Ill. App. 3d 595, 600.

The defendant here has failed to demonstrate the materiality of the information sought or what prejudice, if any, he was caused by the State's nondisclosure of such information.

Even if the defendant's request for this information is viewed has having been brought under Supreme Court Rule 412(h), the grant or

denial of such request is within the discretion of the court upon a showing of materiality to the preparation of the defense. (87 Ill. 2d R. 412(h).) At the post-trial hearing, the court noted it felt the State should have provided more than it did with respect to answering the defendant's supplemental motion for disclosure. However, it also found the public defender's office knew of the Aurora police department's activities with Mason in the role of a confidential informant. Because the court found the Norks' own testimony defeated the defense of entrapment, it determined any other testimony as to the involvement of Mason as a confidential informant would have had no bearing whatever on the issue.

It has been held that factors which must be considered in determining whether the State's failure to comply with a discovery rule warrants retrial include the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose. (*People v. Weaver* (1982), 92 Ill. 2d 545, 560.) Sanctions for failure to comply with discovery are within the discretion of the court (87 Ill. 2d R. 415(g)); a reviewing court will find an abuse of discretion when a defendant is prejudiced by the discovery violation and the trial court fails to eliminate that prejudice. *People v. Weaver* (1982), 92 Ill. 2d 545, 559.

It appears the information sought concerning Mason's confidential informant relationship with the Aurora police department was intended to aid the defense in establishing that it was Mason who was the "prime mover" and who supplied the defendant with the cocaine. The court specifically found it was Mason who supplied the drugs, yet determined that the Norks' testimony established their predisposition. Accordingly, no error is seen in the court's judgment that the defendant was caused no prejudice by any failure of disclosure on the part of the State.

■ The defendant next argues that two circumstances which came to light after his trial demonstrate that the legal representation afforded him was hindered by an actual conflict of interest which denied him a fair trial. Specially, he points to the post-trial hearing on his claim that he was denied the discovery information discussed in the foregoing issue at which hearing it was revealed that an investigator employed by the Kane County public defender's office had obtained information during an interview with Mason about Mason's use as an informant by the Aurora police department. Defendant asserts this information was not shared with his appointed counsel, or at least the information was not completely shared with him. The second in-

stance of conflict which he notes also occurred during the post-trial hearing. At that time, defendant's counsel wanted to question Mason on the stand concerning his involvement with the Aurora police department, but the Kane County public defender appearing on Mason's behalf joined in the State's motion to quash the subpoena, since he felt the risk to Mason's right against self-incrimination would be too great were he to testify.

Defendant asserts it is "reasonable to assume" that Mason was not called as a defense witness at trial because of the conflict of interest created by virtue of the fact that both he and Mason were each represented by attorneys from the Kane County public defender's office. Further, defendant asserts: "One must wonder how much information regarding Mason was denied to the defendant's counsel."

It is clear that a defendant's right to the effective assistance of counsel entitles him to faithful representation free of restraint by virtue of inconsistent duties or divided loyalties on the part of his attorney. (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Stoval* (1968), 40 Ill. 2d 109.) The record here, however, shows no conflict of interest at trial affecting this right.

As the State points out, it is clear defense counsel had no idea until sometime after the trial, shortly before the post-trial hearing, that Mason was also being represented by the public defender's office. It is not clear from the record whether Mason was actually a client of the public defender's office at the time of the defendant's trial. It is clear, however, that he was being represented on a burglary charge which was completely unrelated to the defendant's case. The information which allegedly was "not completely shared" with the defendant's trial counsel was information gathered in an interview of Mason conducted by the public defender's office investigator on October 15, more than two weeks *after* the defendant's trial ended. The interview was being conducted with regard to Mason's unrelated burglary charge, but it incidentally generated some further information about the actual extent of Mason's use as an informant by the Aurora police department. It is clear that at the time of the defendant's trial, his counsel had been advised by this same investigator that Mason had stated in a September 21 pretrial interview that he in fact did have a confidential informant relationship with the Aurora police department.

It has been held that in order to prevail on a claim of ineffective assistance of counsel due to joint representation, a defendant must show an actual conflict of interest manifested at trial, and mere hypothetical or speculative conflicts will not suffice. (*People v. Robinson*

(1979), 79 Ill. 2d 147, 169.) The record here does not provide sufficient facts from which it may be concluded that defendant's counsel was restrained in any way in his representation of the defendant at trial, or that crucial information affecting his trial strategy was withheld. See also *People v. Kendrick* (1982), 104 Ill. App. 3d 426.

With regard to the public defender's motion to quash the subpoena issued for Mason to appear at the post-trial hearing, we note the record shows the court continued the post-trial hearing to a later date so that substitute counsel other than the public defender could be appointed for Mason. We further note that the court took this action even after defense counsel agreed with the assistant State's Attorney that his understanding of the law was that one public defender could advise the witness (Mason) "so long as it is a different public defender than that of the defendant." (*Cf. People v. Miller* (1980), 79 Ill. 2d 454 (where no conflict of interest was found where a defendant and a defense witness who claimed the privilege against self-incrimination were each represented by different assistant public defenders).)

■■ Although defendant argues "it is alarming" that Mason was never recalled to the stand in connection with the post-trial allegations, the record shows that it was at the continued post-trial hearing that the public defender's investigator testified that defendant's counsel was privy to the information that Mason was in fact used by the Aurora police department as a confidential informant. Upon this representation being made to the court, it determined the State's insufficient response to the defendant's supplemental motion for disclosure did not prejudice the defendant, since it appeared his attorney already had constructive, if not actual, notice of the supplemental information sought. The court determined that any further information about the extent of Mason's involvement with the Aurora police department would not have affected its judgment. The court had already specifically found that Mason supplied the cocaine for the defendant, and that the primary basis of its judgment finding the defendant guilty was the fact of the defendant's own testimony and that of his wife which showed his predisposition to commit the offense. Accordingly, the court denied the post-trial motion and quashed the subpoenas.

Defendant argues that at the least a significant conflict of interest existed at the post-trial hearing stage, and the cause should be remanded for a supplemental hearing on the questions raised by this problem. In support, he cites *People v. Blakes* (1985), 131 Ill. App. 3d 1004.

In *Blakes*, however, a conflict of interest was found to have arisen because the defendant's public defender, appointed for purposes of

preparing and arguing the post-trial motion, was called upon to argue the incompetence of defendant's trial counsel, another public defender who was from the same office. No such conflict existed here, and no remand for any further hearing is warranted.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

SCHNAKE, J., concurs.

PRESIDING JUSTICE NASH, dissenting:

I respectfully dissent on two bases. First, after determining the trial court applied an incorrect standard of law in denying defendant's affirmative defense of entrapment, this court should reverse the judgment and remand for a new trial rather than undertake to review the evidence as the finder of fact. Second, contrary to the conclusion of the majority, I consider that the State has not proved the absence of entrapment beyond a reasonable doubt.

As noted in the opinion, the trial court erroneously considered that the defense of entrapment was met if the evidence showed defendant "willingly" committed the offense. (See *People v. Pates* (1981), 84 Ill. 2d 82, 417 N.E.2d 618.) In rendering its verdict after the bench trial the court stated the circumstances of the case raised suspicions where an individual such as the police agent, Mason, is set loose in the community like a "loose cannon," that Mason did supply the drugs to defendant and that the idea originated with Mason. The court considered, however, that because defendant understood Mason's idea and was ready to accept it, that constituted a predisposition and removed the entrapment defense. In a post-trial hearing, the court also stated defendant's willingness to enter into the sale was the decisive point in the case and, at sentencing, the court characterized the transaction as a "cheap shot," but that defendant was not innocent of criminal activity because he willingly participated in it.

In its brief, the State argues the trial court did apply the correct standard, but alternatively suggests, if this court finds otherwise, that use of an improper standard of law in a bench trial would be comparable to the giving of an erroneous jury instruction for which the proper remedy is reversal and new trial.

The majority, however, undertook a *de novo* evaluation of the evidence in which, presumably, it determined the weight to be given thereto and the credibility of the witnesses. I suggest the correct rule where a case has been tried under an incorrect theory of law is to re-

verse the judgment and remand for a new trial, and would do so here. *People v. Francis* (1978), 73 Ill. 2d 184, 383 N.E.2d 161; *People v. Thompson* (1967), 36 Ill. 2d 332, 335, 223 N.E.2d 97.

If this court could properly review the evidence in these circumstances, I would find that the State failed to establish entrapment did not take place or that defendant was predisposed to commit the offense.

It is undisputed that after his arrest for unrelated offenses, Michael Mason was offered leniency by the police if he agreed to set up three deliveries of a controlled substance. While so acting as a police agent (see *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879), Mason brought a small amount of cocaine to defendant's home where, after considerable urging, defendant agreed to deliver it to Mason's customer. Mason thereupon drove defendant to a meeting with an undercover police officer to whom defendant handed the cocaine and received payment. Defendant earned $25 for his service to his friend, Mason. It seems clear to me that the police agent induced defendant to sell the drug for the purpose of obtaining evidence for defendant's prosecution; it seems equally clear the police agent did more than merely afford defendant with the opportunity to commit the offense and that defendant did not originate the criminal purpose. See Ill. Rev. Stat. 1983, ch. 38, par. 7—12.

In many respects the facts here are similar to those in *People v. Martin* (1984), 124 Ill. App. 3d 590, 593, 464 N.E.2d 837, 839, *appeal denied* (1984), 101 Ill. 2d 573, where the court reversed the conviction, finding, "[B]ut for the unrelenting coercion of the paid informant ***, who did not come forward to rebut the fact that he was not only the source of the narcotics but the prime mover in their distribution, the defendant would never have been predisposed to commit the offense in question. *** [W]e cannot say beyond a reasonable doubt that the idea for the crime charged originated with the defendant. [Citation.]" See also *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812.

There was no evidence here defendant ever dealt in drugs or was inclined to do so prior to the arrival of Mason at defendant's home with the cocaine and argument which persuaded defendant to comply with his friend's wishes. It appears to me defendant was drawn into this manufactured crime by a police agent not for any real law enforcement purpose to suppress the sale of drugs, but to relieve Mason of his other liabilities with the police and, perhaps, to enhance the officer's drug arrest records. I think the entrapment defense is designed for situations such as this and would have so held here.