THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v*
ROBERT N. PARKER, Defendant-Appellant.

Fourth District   No. 4—82—0344

Opinion filed March 16, 1983.

322

Greaves & Lerner, of Champaign, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Robert J. Biderman and David E. Mannchen, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:

Parker, a University of Illinois vice-president, was indicted for 157 separate felony thefts of university funds amounting to over $600,000.

His first trial: mistrial.

His second trial: guilty.

His sentence: a single five-year term and a $10,000 fine.

We affirm.

The facts of this case are not really in dispute. A Champaign County grand jury returned an indictment against Robert N. Parker charging him with 157 counts of theft over $300. Each count alleged that Parker had—by means of deception—exerted unauthorized control over funds of the University of Illinois Foundation (UIF) and the U.D. Corporation (UDC). Parker was granted a change of venue and his first trial was held in Jefferson County. It ended in a mistrial when the jury could not reach a verdict. A change of venue to Winnebago County was granted. Following his jury trial there, Parker was found guilty and sentenced.

Parker admits to writing some $600,000 of unauthorized checks on the account of UDC to various Chicago nightclubs and to a number of individuals. He also admitted submitting false vouchers to obtain funds from UIF to cover the checks. He sought to interpose several defenses at trial, namely necessity, compulsion, and insanity. Before this court on appeal, Parker claims numerous errors in instructing the jury, including refusing to instruct regarding these defenses. He also

claims: that he was denied due process when the State failed to *sua sponte* disclose exculpatory material; that venue was not proved beyond a reasonable doubt; that the prosecutor's closing argument deprived him of a fair trial; and that the sentence imposed was excessive.

We shall discuss the *Brady* problem first.

### *Brady v. Maryland*

At Parker's first trial, two psychiatrists—Dr. Grater and Dr. Ziporyn—testified for the defense and Dr. Traugott testified for the People. At the second trial, these three again testified and the People also presented testimony by Dr. Pugh, another psychiatrist. Needless to say, there was a split of opinion among the four doctors on the issue of Parker's sanity. After Parker's conviction, it was revealed by way of stipulation that Dr. Pugh had called the State's Attorney during the hiatus between the first and second trials and had volunteered to both examine Parker and to testify. Because this evidence was not disclosed prior to trial, Parker contends that under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, he was denied due process.

While *Brady* is factually dissimilar to the case presently at bench, the rule of law it spawned goes beyond its particular facts. The Supreme Court in *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392, indicated that the *Brady* rule applies in at least three situations: (1) where the State knowingly puts on perjured testimony; (2) where the State suppresses exculpatory evidence which is specifically requested by the defense (as was the case in *Brady*); and (3) where the State fails to disclose, *sua sponte*, evidence which is both exculpatory and material. Parker contends that the facts of this case fit into the third category.

Under *Agurs*, the first question for this court in assessing Parker's contention is whether the evidence regarding Dr. Pugh was exculpatory. It was. Evidence that he volunteered to give an opinion as to Parker's sanity before having examined him is indicative of bias. Bias can, of course, be used to impeach a witness' credibility. Impeaching Dr. Pugh's credibility was certainly exculpatory, as he opined that Parker was sane at the time he performed the *actus reus* portion of the crime with which he was charged. If his testimony is shown to be unworthy of the jury's consideration, then, unless there is other evidence on the sanity issue, the State has not sustained its burden. See *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (defendant's right to due process was violated where the

State failed to disclose that its key witness, a codefendant, had been promised immunity).

In this case, there was other evidence on the sanity issue. This brings us to the second step in the *Agurs* analysis—the materiality of the evidence showing Dr. Pugh's bias. *Agurs* holds that in this context, material evidence is that which creates a reasonable doubt where none existed before. A finding of materiality does not necessarily mean that the evidence would likely have swayed the jury, but its exclusion is certainly not harmless error. See *Agurs*.

*Agurs* itself held that evidence of the victim's prior convictions for weapons offenses was not material in a murder prosecution where defendant stabbed her victim following a "brief interlude in an inexpensive motel room." (*United States v. Agurs* (1976), 427 U.S. 97, 98, 49 L. Ed. 2d 342, 347, 96 S. Ct. 2392, 2395.) The rationale stated for the court's decision was that the jury had before it ample evidence to show that before the interlude, the victim had possessed the weapon which brought about his demise.

Two cases—*Giglio* and *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, although they both predate *Agurs*—nicely set out the parameters of what is material and what is not. *Giglio* was a forgery prosecution where, as noted above, the government failed to disclose that its key witness was testifying under a grant of immunity. The witness' testimony was the only evidence linking defendant to the crime. The court held that the defendant was entitled to a new trial because of the government's failure to disclose this fact.

*Moore* was a murder prosecution where the State failed to disclose a statement by a witness that "Slick" (someone other than the defendant) admitted the murder to him. This evidence was not material and there was no error to fail to disclose it because two eyewitnesses identified the defendant as the killer; three persons put defendant in the bar where, and at the time, "Slick" allegedly made his admission; and two witnesses testified to other admissions by the defendant. Consequently, the impeachment value was too insignificant to warrant reversal.

■ Thus, three factors become significant in determining the materiality of impeachment: (1) the importance of the witness to the prosecution's case (*Giglio*); (2) the nature of the evidence itself (*Moore*); and (3) whether there was other evidence in the case of a similar character (*Agurs*). (See also *United States v. Nixon* (5th Cir. 1981), 634 F.2d 306, and *Breest v. Perrin* (1st Cir. 1980), 624 F.2d 1112.) Taking these three factors into consideration, we find that the

evidence here was not material.

First, Dr. Pugh was not the lynch pin of the State's case against Robert Parker. Parker's sanity was the main issue at trial, but Dr. Pugh's testimony added little new or different to the State's case. Rather, it simply echoed the testimony of Dr. Traugott. There was also a good deal of testimony from lay witnesses about Parker's actions which would support a finding of sanity and which the jury could have considered in refusing to accept the testimony of defendant's experts.

Defendant's theory was that he could not conform his actions to the requirements of the law because he was suffering from twin delusional beliefs: (1) his superiors were abusing their position, and (2) by his actions, he was only taking what he deserved. The very foundation of this theory is shaken by the fact that Parker went to considerable lengths to conceal his thefts and was successful in doing so for over five years.

Parker claims that Dr. Pugh's testimony was significantly different from the other expert testimony because Pugh based his opinion that Parker was sane on the fact that nothing Parker said sounded implausible while no other expert mentioned plausibility as a factor in diagnosing delusional paranoia. The defendant's argument belies the fact that there was no disagreement that a delusional belief is a false belief held despite the inability to convince even one other person of its validity. Dr. Pugh's testimony indicates that he was simply extrapolating from that definition—if you cannot convince even one other person that something is true, that something must be implausible.

Additionally, on cross-examination, Dr. Pugh was forced to admit that implausibility was not included in the definition of delusion found in the standard text for diagnosing psychiatric illness (referred to at trial as DSM III). Cross-examination of Dr. Pugh also revealed that he had examined the defendant for only two hours and had never performed any standardized test on him.

Finally, and perhaps most importantly, counsel for the defendant pointed out that Dr. Pugh rendered his opinion without discussing with Parker any of the number of supposedly delusional beliefs which Parker held. Nor did Dr. Pugh personally check to see if the beliefs were held by anyone else (relying instead on representations by others, including the State's Attorney, that Parker's beliefs were not shared by others). The record contains scant—if any—evidence that others held Parker's beliefs regarding his superiors. So, the jury already had before it the insufficiencies of the basis for Dr. Pugh's opinion. While the evidence that he volunteered to testify might have been

helpful, we cannot say that it was material under the *Agurs* standard. It does not raise a reasonable doubt where none otherwise existed.

## VENUE

■■■ Turning to the next issue raised by defendant, we find that venue was established in Champaign County beyond a reasonable doubt and that there was not even a sufficient question to warrant instructing the jury on the issue. Venue in a case of theft, including theft by deception, can be had in a county where control over the property is exerted. *People v. Whitlow* (1980), 86 Ill. App. 3d 858, 411 N.E.2d 1354, *aff'd* (1982), 89 Ill. 2d 322, 433 N.E.2d 629; *People v. Massarella* (1979), 80 Ill. App. 3d 552, 400 N.E.2d 436.

In this case, it is clear that Parker wrote the unauthorized checks in Cook County, but this does not mean that venue was proper *only* there. Janier Koss, Parker's secretary when he was employed at the University of Illinois, gave uncontradicted and unimpeached testimony that the UDC checks were "covered" with funds from UIF and that to accomplish this transfer, it was necessary to complete a voucher and submit it to the Foundation. Koss testified that these vouchers were prepared by her in Champaign County. The vouchers were an exercise of control which established venue beyond a reasonable doubt. That venue may also have been appropriate in some other county is not enough to raise a jury question as to the issue, and Parker was not entitled to an instruction. See *People v. McClain* (1978), 60 Ill. App. 3d 320, 376 N.E.2d 774.

### CLOSING ARGUMENT

In his rebuttal argument, the State's Attorney referred twice to Dr. Ziporyn as a "hired gun." Parker did not immediately object, but moved for a mistrial as soon as the jury had retired to deliberate. The motion was denied, and Parker claims this was error.

■ The "hired gun" argument was rejected in *Regan v. Vizza* (1978), 65 Ill. App. 3d 50, 382 N.E.2d 409, not because it is *per se* error, but because the comment was not supported by the evidence. Although *Regan* is a civil case, a similar result would obtain in a criminal case—it is error to make comments in closing argument which are not supported by the evidence. See *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.

There is some evidence to support the prosecutor's argument in this case. His cross-examination of Dr. Ziporyn shows that the doctor had testified for the accused in some 250 to 350 criminal cases and had given the opinion that the accused was insane each time. Ziporyn

had not testified for the prosecution in a criminal case since 1965—when he left the staff of the Cook County Circuit Court. Thus, this case is a far cry from *Regan*, where the *treating* physician was referred to as a hired gun.

■ We need not reach this issue, however, because we hold that Parker's objection was not timely and thus any error was waived. (*People v. Gerecke* (1977), 45 Ill. App. 3d 510, 359 N.E.2d 1178.) Nor is the comment so prejudicial as to rise to the level of plain error. We do note, however, the disfavor with which this type of argument is regarded and discourage its use in the future. The "hired gun" epithet is simply in bad form.

### JURY INSTRUCTIONS

#### (a) Necessity and Compulsion

Parker claims the court's instructions to the jury were defective in several regards. His first contention is that it was error to refuse his tendered instructions on the defenses of necessity and compulsion. Parker is only entitled to such instructions if they are supported by the evidence. *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319.

The defense of *necessity* is codified in section 7—13 of the Criminal Code of 1961. (Ill. Rev. Stat. 1981, ch. 38, par. 7—13.) The person raising the defense must (1) be without blame in occasioning or developing the situation, and (2) reasonably have believed that his conduct was necessary to avoid a greater public or private injury than otherwise might have resulted from his conduct.

■ The defense of necessity is not available to Parker. He initially went to Club Taray of his own volition and thereby made himself a target for the type of people who frequent such places. His repeated returns aided in developing the situation where he had to choose between two evils. And, his choice was not of the lesser evil. It is not reasonable to believe that he had to steal $600,000 to avoid physical harm or to save his reputation. He could have stopped frequenting the Club Taray, reported his activities to his superiors and to the Champaign County police, and thereby avoided having to commit any crime at all.

■ The defense of *compulsion* is likewise unavailable to Parker. This defense, which is codified in section 7—11 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 7—11), is available when (1) an offense is committed under the threat of death or great bodily harm, and (2) the person committing the offense reasonably believes that death will result if he fails to perform the act constituting the

offense. Here, there was certainly no threat of imminent death or great bodily harm. At most, there is a threat of some unspecified future harm. The evidence does not support a reasonable belief that death or great bodily harm would result if Parker did not steal money from UIF or UDC.

### (b) Insanity Defense

■ Parker also contends that the jury should have been instructed on the result of a verdict of not guilty by reason of insanity. It was not error to refuse either instruction urged by the defendant.

First, the optional portion of Illinois Pattern Jury Instruction (IPI), Criminal, No. 1.01 (2d ed. 1981), which defendant urges should have been given, should only be given where the issue of punishment is raised in final arguments. The question of penalty was never raised by either side at any point in the extended closing arguments in this case. The logic of the committee notes on this instruction is compelling, and we adopt it. The jury should not be told not to do something they may not have considered doing in the first place. Thus, there was no error in refusing to give paragraph 4.

As to the non-IPI instruction offered by the defendant, it is identical to the instruction rejected in *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058. *Meeker* held that the jury should not be told of the consequence of a verdict of not guilty by reason of insanity because it would inject extraneous and irrelevant matters into the jury's deliberation. We agree and find *Meeker* controlling here.

### (c) Statements by the Defendant

Parker next objects that the jury should not have been instructed on consideration of statements by the defendant. The case relied upon in support of his argument, *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328, is totally irrelevant.

■ *Hicks* involved IPI Criminal No. 2.04 (dealing with the failure of the defendant to testify). People's Instruction No. 8, of which defendant complains, was not IPI Criminal No. 2.04, but IPI Criminal Nos. 3.06, 3.07. Although IPI Criminal No. 2.04 is to be given only upon the defendant's request, there is no indication that a similar limitation should be put on the use of IPI Criminal Nos. 3.06, 3.07. On the contrary, the purpose of the latter instructions is to call the jury's attention to the fact that defendant's statements should be considered without characterizing them as confessions. See IPI Criminal Nos. 3.06, 3.07, Committee Note, at 20 (2d ed. 1981). No error.

### (d) Witnesses Testifying Under Grants of Immunity

Parker also contends that it was error to refuse to give his instruction No. 2, which was a non-IPI instruction dealing with the weight to be given testimony of persons testifying under grants of immunity.

Defendant relies on *People v. Bertucci* (1980), 81 Ill. App. 3d 851, 401 N.E.2d 1123, in support of his argument. *Bertucci* did hold that it was error to refuse to give a similar instruction but, as defendant acknowledges, found the error to be harmless because the fact that a witness was testifying under a grant of immunity was put before the jury and because a general credibility instruction (IPI Criminal No. 1.02) was given.

■ IPI Criminal No. 1.02 was also given in this case, and the jury was made aware of the fact that certain witnesses were testifying under grants of immunity. While no mention of immunity was made in closing argument, the error was almost certainly harmless. The witnesses by and large testified as to facts which defendant admitted. And, their testimony, even viewed in the light most favorable to the defendant, was insufficient to establish the defenses of necessity and compulsion.

### (e) Reputation Evidence

■ The final error defendant raises in connection with instructions to the jury is the refusal to give his instruction No. 5, which was IPI Criminal No. 3.16 (reputation evidence). The trial judge refused the instruction because Parker had admitted the thefts. Parker contends here that because insanity involves a change in personality, the fact that he was once considered honest is important. While we agree that evidence concerning Parker's reputation for honesty was introduced at trial, we cannot agree that it was error to refuse the reputation instruction. Parker admitted the thefts, and reputation is not relevant to the issue of sanity in this case. When determining the issue of sanity, the focal point is the time that the defendant committed the offenses charged, not a change in personality of some unspecified time in the past.

### SENTENCE

■ The last issue raised by Parker is the excessiveness of his sentence. Imposition of a sentence following conviction of a crime is within the sound discretion of the trial judge and should not be disturbed absent an abuse. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

In support of his argument that abuse occurred, Parker stresses that he had no prior criminal history and physically harmed no one. In urging this court to affirm the sentence, the State argues that Parker abused his office in committing his offense and that the sentence is necessary to deter others. All these factors are properly considered in imposing sentence. See Ill. Rev. Stat. 1981, ch. 38, pars. 1005—5—3.1, 1005—5—3.2.

■■ Given the seriousness of this offense, and the surrounding circumstances, we cannot say that an abuse occurred. (See *People v. Ballard* (1978), 65 Ill. App. 3d 831, 382 N.E.2d 800.) Parker, while employed in a position of trust, stole a great deal of money. In point of fact, he purloined nearly two-thirds of a million dollars, committing felony theft a total of 157 times. Clearly, five years is not too great a sentence to punish him and to discourage others from following his example.

Affirmed.

TRAPP and MILLER, JJ., concur.