THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HAROLD A. FOREMAN, Defendant-Appellant.

Second District   No. 2—85—1022

Opinion filed March 13, 1987.

Robert P. Will, Jr., of Will & Briscoe, Ltd., of Waukegan, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Dale M. Wood, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Defendant, Harold A. Foreman, was charged by indictment with the offenses of unlawful delivery of a controlled substance (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)) and unlawful possession of controlled substance with intent to deliver (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)). Following a jury trial, defendant was found guilty on both charges. Judgment was entered on the verdict, and defendant was sentenced to 18 years' imprisonment and fined $100,000. Defendant appeals from the judgment and sentence.

In this court defendant contends: (1) that he was not found guilty beyond a reasonable doubt; (2) that the trial court erred in refusing his entrapment instruction; (3) that the trial court's sentence was improper and excessive; and (4) that the trial court erred in refusing to return

bond money to defendant's uncle who had provided it.

Briefly summarized, the testimony at trial showed that Lawrence Oliver, an undercover police officer with the Lake County Metropolitan Enforcement Group (M.E.G.), met defendant through George Seaverns. Seaverns had been previously arrested in November 1984 by another M.E.G. agent for possession of cocaine and subsequent to his arrest had agreed to introduce Oliver to various drug dealers. According to Oliver, no guarantees were made to Seaverns in return for these introductions. Seaverns was told only that his cooperation would be a consideration in the prosecution of criminal charges against him.

On February 7, 1985, Oliver and Seaverns met defendant and another individual at Bennigan's Restaurant in Northbrook, Illinois. At that meeting, defendant gave Oliver approximately three grams of cocaine for Oliver to try in the washroom. Upon returning from the washroom, Oliver and defendant reached an agreement concerning a sale for two kilograms of cocaine which was to occur on February 11, 1985, at the Lake Forest oasis. Defendant also informed Oliver that he could provide him with "two keys" per week.

On February 11 Oliver and defendant met in the parking lot of the Lake Forest oasis. Defendant parked next to Oliver's car, entered the car, and handed Oliver 1.5 kilograms of cocaine. Almost immediately thereafter, other drug-enforcement agents surrounded Oliver's car and arrested defendant. Defendant was taken to the Lake Forest police department, where he gave an incriminating, voluntary statement which was taped. This tape was admitted into evidence.

The defendant testified that he had first met George Seaverns in May 1984, at a party in the home of a mutual friend in Illinois while defendant was visiting from Florida. Persons at the party, including defendant and Seaverns, were doing lines of cocaine. Subsequently, in November of the same year, Seaverns phoned defendant in Florida inquiring about a source for buying cocaine. According to defendant, Seaverns contacted him about 20 times over the next two months. At the time of each contact, defendant denied knowledge of a source of cocaine until February 1985, when defendant contacted Seaverns and agreed to sell him two kilograms of cocaine for $82,000.

It was defendant's testimony that he agreed to deliver this cocaine because some Colombians in Florida who had given defendant cocaine at several parties attended by defendant had threatened to kill him if he did not either pay them for the cocaine or provide them with cocaine purchasers. According to defendant, he had no money, so he set up the sale with Seaverns.

Defendant stated that he was accompanied from Florida to Illinois

by the Colombians and that at all times he was under their custody or surveillance. When defendant met with Seaverns and Oliver at Bennigan's Restaurant, he was accompanied by another individual named Terry who defendant maintained was working with the Colombians. Defendant testified that when he went to the oasis to meet Oliver, he was followed by the Colombians, who told him that if anything went wrong with the transaction, he would be killed. At the oasis, defendant pulled alongside of Oliver's car, entered it, and initiated the transaction by giving Oliver the cocaine. Defendant was then arrested by other agents and taken to the Lake Forest police station, where he gave a statement which did not mention any compulsion by the Columbians. Defendant explained to the officers at the station that a piece of paper, containing the name "Kiko" and a phone number, which was found on his person referred to his Colombian connection.

It was defendant's explanation that he did not mention the compulsion because he feared what the Columbians would do to him or his family. Defendant maintained that a beating he suffered at the hands of another inmate prior to his release on bond indirectly resulted from the Colombians. Defendant stated that the inmate who beat him up told him the beating was from Kiko and that Kiko had heard defendant had been talking. An inmate who witnessed the beating stated he never heard the word "Kiko" mentioned. On cross-examination defendant admitted that he never told his jailers what the inmate who hit him said. Also, on cross-examination it was shown that during the eight-month period defendant was out on bond and prior to his trial, no threats were made or injuries occurred to either his family or him.

The jury found defendant guilty of both unlawful delivery of a controlled substance and unlawful possession of a controlled substance with intent to deliver. The latter offense was dismissed based on defendant's conviction for the unlawful delivery of a controlled substance. The trial court entered judgment on the verdict. At a subsequent sentencing hearing, the court imposed a sentence of 18 years' imprisonment and a fine of $100,000. This appeal followed.

Defendant first contends that he was not proved guilty beyond a reasonable doubt since the State failed to sufficiently disprove defendant's affirmative defenses of entrapment and compulsion.

In Illinois the defense of entrapment is defined by statute as follows:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or

employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1985, ch. 38, par. 7—12.)

Defendant maintains that George Seaverns became an agent of the Metropolitan Enforcement Group when he agreed to set up some drug deals for Agent Oliver in return for consideration by the agency regarding whether or not to prosecute Seaverns for possession of cocaine. It is defendant's position that Seaverns' repeated phone calls to defendant in Florida, seeking a source of cocaine, constituted governmental involvement which induced him to commit the offense that he was otherwise not predisposed to commit.

■ We have previously held that to establish the affirmative defense of entrapment, the evidence must disclose improper inducement on the part of the government and a lack of predisposition to commit crime on the part of the defendant. (*People v. Norks* (1985), 137 Ill. App. 3d 1078, 1083, 484 N.E.2d 1261.) The defendant must be an "innocent" person who would not have committed the crime had he not been induced. (*People v. Johnson* (1984), 123 Ill. App. 3d 363, 369, 462 N.E.2d 948.) As the State points out, the evidence in this case does not support either prerequisite.

■ The mere fact that Seaverns contacted defendant by phone on approximately 20 occasions regarding whether defendant knew a source for cocaine does not establish inducement by the government. (See *People v. Villanueva* (1977), 46 Ill. App. 3d 826, 361 N.E.2d 357.) Moreover, despite the fact that defendant scarcely knew Seaverns, that the phone conversations between the two always led to a discussion of defendant's knowledge of a possible source of cocaine, and that defendant continuously denied any knowledge of such a source, defendant never once refused to accept these phone calls and never told Seaverns to stop calling him. When the subject of a cocaine sale with the defendant did finally arise, that subject was initiated by the defendant, who phoned Seaverns to inform him that defendant could supply cocaine. Additionally, after informing Seaverns that he could supply cocaine, defendant, upon his arrival in Chicago, set up a sampling and brought the sampling to a restaurant where he met Seaverns and agent Oliver. At the restaurant defendant provided Oliver with a free three-gram sample and an offer to regularly supply Oliver with two kilograms per week in the future. Thus, defendant not only agreed to the initial delivery of two kilograms but indicated a desire to establish a continuing distribution of the drug. All these acts reflected both a lack of inducement on the part of the government and an intent on defendant's part

to commit the crime when opportunity afforded.

Furthermore, defendant's own testimony dispelled his entrapment defense when he testified that he agreed to deliver cocaine to Seaverns because he was in serious trouble with some Colombians in Miami to whom he owed money for cocaine. Defendant stated that the Colombians threatened to kill him unless he set up a deal with Seaverns. Thus, as the State correctly points out, it is apparent from defendant's own testimony that the delivery did not result from any inducement by Seaverns but from completely separate reasons.

■ Moreover, the evidence demonstrated that defendant was predisposed to commit the crime. In determining whether a defendant is predisposed to commit a crime, courts will look to a number of factors, including whether the defendant: was engaged in drug trafficking prior to the present incident or had otherwise engaged in criminal activity; easily acquiesced in the request to supply drugs and had a ready source from which to purchase drugs; had familiarity with drugs; displayed an initial reluctance or refusal to enter into a narcotics transaction; possessed a willingness to make a profit from the deal; and initiated the final transaction. *People v. Norks* (1985), 137 Ill. App. 3d 1078, 1083-84, 484 N.E.2d 1261.

Defendant's taped voluntary statement, which was made by defendant shortly after his arrest and which was entered into evidence, reveals that defendant had acted as a seller/deliveryman for these same Colombians on a prior occasion. On this prior occasion, he had received $1,000 for his part in the transaction. On the date of his arrest defendant was to be paid $2,000. In his statement defendant also admitted that prior to the incident in question he had participated in two to three multi-kilograms deals per year. Additionally, he had participated in the past in sales of lesser amounts. These admissions showed defendant was engaged in drug trafficking prior to the present incident.

Although defendant did not immediately acquiesce to Seaverns' request for drugs, delaying for two months before admitting to Seaverns that he had a source of supply, he never, during this period of time, refused to enter into a narcotics transaction. Rather, he just denied knowledge of a source. Any initial hesitancy or reluctance, as displayed by a defendant, is understandable when one ostensibly deals in drugs. (*People v. Dennis* (1981), 94 Ill. App. 3d 448, 453, 418 N.E.2d 479.) However, when defendant eventually agreed to supply cocaine to Seaverns, it was defendant who initiated the final transaction. Also, the evidence showed that defendant's source of supply was the Colombians, that he was going to make $2,000 on the transaction at bar, and that he had previously made $1,000 in another transaction with these

same individuals.

Additionally, defendant's familiarity with drugs was brought out through agent Oliver's testimony regarding his meeting with defendant at Bennigan's, through defendant's testimony at trial, and through defendant's own taped statement. These accounts demonstrated defendant's familiarity with drug terminology and his awareness of drug procedures, e.g., his insistence at the restaurant on properly packaging the three-gram sample for Oliver into a "snow seal" or drug envelope, common among drug deals.

Considering all these factors, it is evident that defendant was predisposed to commit the crime in question.

■■ Whether a defendant has been unlawfully entrapped is a factual question for the trier of fact. (*People v. Gresham* (1981), 96 Ill. App. 3d 581, 583, 421 N.E.2d 1053.) Here, the trier of fact was the jury, and, thus, the question of entrapment was one normally for it to decide, unless, however, the trial court could find entrapment as a matter of law. In this case, the court, in refusing defendant's jury instruction regarding entrapment, found, as a matter of law, that defendant did not present any evidence constituting entrapment. The evidence, as discussed above, supports the court's conclusion that defendant was not entrapped, and, thus, any contention that the affirmative defense of entrapment negates defendant's guilt beyond a reasonable doubt is without merit.

■■ Likewise, the State's evidence also sufficiently refuted defendant's affirmative defense of compulsion despite defendant's claim that "[t]here was not scintilla of evidence to refute defendant's claim that he acted out of compulsion by the Colombians [*sic*]." The defense of compulsion is available when an offense is committed under threat of death or great bodily harm and the person committing the offense reasonably believes death will result if he fails to perform the act constituting the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 7—11; *People v. Parker* (1983), 113 Ill. App. 3d 321, 328-29, 447 N.E.2d 457.) In his testimony defendant maintained that the Colombians had used physical force to get him to make the drug deal with Seaverns and that he feared they would kill him if he did not participate in the drug sale to Oliver. Defendant related that he was accompanied by the Colombians from Florida to Chicago, was kept in their custody at all times while in Chicago, and was threatened with death if anything went wrong during the transaction with Oliver.

Although defendant was alone at the time he made the transaction with Oliver, defendant stated that he was followed by one of the Colombians. However, despite his contention that the Colombians had a

machine gun and a high-powered rifle, defendant admitted that he never saw the individual who allegedly followed him get in the car with a gun. Defendant testified that the Colombians had told him they would be in the parking lot at the oasis and that they would kill him and Oliver if anything looked "funny" in the lot. Yet, nothing occurred at the time of his arrest.

It was defendant's testimony that the taped statement he gave to the police following his arrest consisted of lies. Defendant stated that he feared if he told the truth the Colombians would harm him or his family. However, defendant also admitted that in the eight months since he had been out on bond, neither he nor his family had been threatened or harmed. Also, we note that at the time of his arrest, police found a piece of paper on defendant bearing the name "Kiko" and a phone number. Defendant told police this was his Colombian connection. We find this statement, incriminating Kiko, to be inconsistent with his claim that he falsified his taped statement because he feared harm at the hands of the Colombians.

In his statement, defendant freely admits his present and past involvement in drug deals. Defendant refers to the Colombians, mentioning that on the date of the transaction in question he acted as seller or deliveryman for a Colombian named Kiko. Defendant's statement reveals that the Colombians drove the cocaine up and gave it to defendant, who was to transport it to the oasis for delivery. The Colombians were to contact defendant later by phone to arrange to collect the money defendant was to receive. Defendant admits on the tape having dealt with these individuals on one other occasion and that he was to be paid $2,000 for the instant delivery.

Defendant's account at trial regarding his participation in the drug transaction was directly contradictory to the account provided in his taped statement. The jury heard both versions and was entitled to consider the reasonableness of the compulsion defense offered, assess its probabilities, if any, and reject the evidence which it found to be contradictory, unlikely, or improbable in light of the other facts before it. *People v. Eliason* (1983), 117 Ill. App. 3d 683, 696, 453 N.E.2d 908.

The defense of compulsion is a question of fact (*People v. Jackson* (1981), 100 Ill. App. 3d 1064, 1067, 427 N.E.2d 994), and the resolution of factual disputes as well as the assessment of the credibility of the witnesses are for the jury (*People v. Gharst* (1984), 122 Ill. App. 3d 1, 6, 460 N.E.2d 813). Moreover, a reviewing court will not reverse a conviction unless evidence is so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt remains. (122 Ill. App. 3d 1, 6, 460 N.E.2d 813.) In light of the facts presented here, we cannot say

that the evidence that defendant was not compelled was so improbable or unsatisfactory as to leave a reasonable doubt of guilt.

Accordingly, we conclude that as the evidence was sufficient to rebut defendant's affirmative defenses of entrapment and compulsion, defendant's guilt was proved beyond a reasonable doubt.

■ Defendant's second contention is that the trial court erred in refusing to give defendant's entrapment instructions to the jury. While it is recognized that "slight evidence" will justify an instruction on a given defense (*People v. Chatman* (1982), 110 Ill. App. 3d 19, 22, 441 N.E.2d 1292), it is not error for a trial court to refuse a defendant's proposed jury instruction on a particular defense when there is no evidence supporting the proffered instruction. (*People v. Mitchell* (1985), 136 Ill. App. 3d 205, 208, 482 N.E.2d 1046.) Before instructing the jury on any affirmative defense, the trial court must initially resolve the threshold question whether some evidence supports the particular theory. *People v. Vaughn* (1983), 116 Ill. App. 3d 193, 198, 451 N.E.2d 898.

Here, defendant's entrapment theory was based primarily on the fact that Seaverns, acting as an agent of M.E.G., phoned him numerous times between November and February seeking a source of cocaine. However, as discussed above, defendant, not Seaverns, eventually initiated the transaction which resulted in defendant's arrest. Also, defendant's own testimony was that he was compelled by the Colombians to contact Seaverns and to arrange a drug sale. Thus, in so testifying, defendant refuted his theory that his delivery of cocaine was induced by Seaverns' request.

■ If a defendant is engaged in a course of conduct involving similar offenses, he cannot successfully maintain that he was entrapped. (*People v. Dempsey* (1980), 82 Ill. App. 3d 699, 701, 403 N.E.2d 924.) Here, although defendant claimed he was induced to sell drugs by Seaverns' frequent phone calls, defendant's taped voluntary statement established that he had been engaged in a course of conduct involving similar drug transactions prior to the transaction in question. The lack of predisposition to engage in illegal activity is an essential element of the defense of entrapment. (*People v. Shestiuk* (1978), 59 Ill. App. 3d 296, 299, 376 N.E.2d 56.) That element was clearly absent in the case at bar, and, consequently, we conclude the trial court did not err in refusing defendant's entrapment instructions.

■ Even if we were to assume, however, that Seaverns' phone calls constituted "slight evidence" of entrapment and that, therefore, it was error for the court to refuse defendant's entrapment instructions, we would deem the error harmless. An error in refusing an instruction does not always justify reversal where the evidence of

defendant's guilt is so clear and convincing that a jury could not reasonably have found the defendant not guilty. (*People v. Thompson* (1984), 125 Ill. App. 3d 665, 677, 466 N.E.2d 380.) In the instant case, the evidence of defendant's guilt was of such a nature that we believe the jury could not reasonably have found defendant not guilty even if it had been instructed as to the entrapment defense. Thus, the court's refusal to give defendant's entrapment instructions to the jury did not deny defendant a fair trial.

Next, defendant contends that his sentence of 18 years' imprisonment was improper and excessive. It is defendant's position that he fell within the trial judge's category of disfavored offenders and, as a result, the judge failed to consider mitigating factors and defendant's rehabilitative potential.

We note first that the defendant's claim that he fell within the trial judge's category of disfavored offenders, as did the defendant in *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168, is an attempt to misrepresent what the judge actually said. In *Bolyard*, the defendant, who was convicted of indecent liberties with a child, requested a term of probation at the sentencing hearing. The trial judge, in sentencing the defendant to 6 to 18 years in the penitentiary, specifically stated that he adhered to the policy that any crime involving sexual violence was not probational and that there was no excuse for what he considered to be the " 'most sinful, reprehensible act of all offenses.' " 61 Ill. 2d 583, 585, 338 N.E.2d 168.

The record in the instant case shows that the judge did find particularly offensive those individuals who sell drugs solely for the income and not for the maintenance of a drug habit. But the record is clear that the judge did not consider defendant to be a member of this group which sells "for greed." Additionally, the judge noted that he did not consider defendant to be part of the group which sells strictly for the purpose of maintaining a habit. The judge specifically stated that defendant fell somewhere in between these two groups. Thus, even if we were to conclude that the judge had a class of disfavored offenders, namely, those drug dealers who sell only for income, the trial judge determined that defendant did not fall within this class, and, therefore, any contention that defendant's sentence was based on such a classification is meritless.

Defendant also maintains that the trial court failed to consider mitigating factors and his rehabilitative potential. It is well established that a trial court has wide discretion in matters of sentencing, and the length of the sentence is particularly within the court's discretion. (*People v. Moffitt* (1985), 138 Ill. App. 3d 106, 113-14, 485 N.E.2d

513.) A court of review may intervene only upon a showing that the trial court abused the sentencing discretion entrusted to it. (*People v. Willingham* (1982), 89 Ill. 2d 352, 364, 432 N.E.2d 861.) No such showing is present here.

Our review indicates the trial judge considered the presentence report before him and that he heard evidence in mitigation and aggravation. Where mitigation evidence is before the court, it is assumed the sentencing judge considered the evidence, absent some indication other than the sentence imposed, to the contrary. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 109, 458 N.E.2d 1370.) This is especially apparent where, as here, a review of the record establishes that the defense attorney did, in fact, argue factors in mitigation, including the defendant's rehabilitative potential. *People v. Burba* (1985), 134 Ill. App. 3d 228, 239, 479 N.E.2d 936.

It is also well established that the nature and circumstances of the offense as well as the history and character of the defendant should be governing factors in imposing sentencing. (*People v. Moffitt* (1985), 138 Ill. App. 3d 106, 115, 485 N.E.2d 513.) The objective of restoring a defendant to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense, and the prime responsibility for striking the proper balance between these two factors rests with the trial court. (*People v. Bergman* (1984), 121 Ill. App. 3d 100, 109, 458 N.E.2d 1370.) In drug-related cases the amount of a controlled substance is relevant to the seriousness of the offense. *People v. Moffitt* (1985), 138 Ill. App. 3d 106, 115, 485 N.E.2d 513.

The amount of cocaine found in defendant's possession was 50 times the minimum required to constitute a Class X offense and was of 88% purity. It is clear from the record that the trial judge considered the large quantity of cocaine involved in the sale in question plus defendant's compensation for that sale and his admissions to an M.E.G. officer that he had been involved in previous deals. The court commented that there was nothing to excuse defendant's conduct other than his own use of the drug, which the court did not believe constituted an excuse to sell drugs. Moreover, the court pointed out that the presentence report indicated defendant was only a casual user and that the court believed defendant's use or nonuse of cocaine went strictly to the extent of the punishment. In this regard the court determined that the State's recommendation of 25 years constituted too great a penalty, whereas defendant's request for a six-year sentence was insufficient.

The court also had before it the evidence presented at trial which showed that defendant intended to establish a marketplace in Illinois

for cocaine. Agent Oliver testified that defendant indicated that his source of supply was the Colombians who brought the cocaine into Florida and then gave it to various dealers to sell. Oliver stated that defendant told him he could supply Oliver with a minimum of two kilograms of cocaine per week in the future. It is apparent from his comments in sentencing the defendant that the trial judge, like the jury, elected to believe this version of the drug transaction which revealed defendant was a drug dealer.

In sentencing defendant the court made note of the fact that when the legislature set the penalties for the offense of which defendant was convicted, its intent was to prevent an individual from benefitting from drug sales and to deter others. We believe the court considered this intent as well as defendant's rehabilitative potential in assigning a sentence which fell within the middle range of the statutory framework of from 6 to 30 years' imprisonment for this Class X felony.

The trial court, which is charged with the responsibility of sentencing, is authorized to conduct an evidentiary hearing to gather information required for a reasoned judgment as to the appropriate sentence to impose, and this judgment is based on the circumstances of each case. (*People v. Bolyard* (1975), 62 Ill. 2d 583, 589, 338 N.E.2d 168.) A sentence is excessive only when it cannot be justified by any reasonable view which may be taken of the record. (*People v. Hoffman* (1974), 25 Ill. App. 3d 261, 270, 322 N.E.2d 865.) Under the circumstances present here and the record before us, we are convinced that defendant's 18-year term of imprisonment for the unlawful delivery of a large quantity of cocaine is not excessive.

Last, defendant asserts that the $7,000 bail deposit, provided by his uncle, should have been returned to the uncle and not used toward payment of defendant's $100,000 fine. Defendant's theory here is apparently twofold: (1) that since the uncle has done nothing wrong, he should not be punished for the errant behavior of his nephew, and (2) that such an action by the court will have the effect of deterring anyone from posting bond for a defendant charged with a drug-related offense.

Defendant's theory, however, cannot discount the fact that the defendant signed bond forms providing: "in the event a judgment is entered against said defendant for a fine and/or court costs, the balance of such deposit, after the deduction of bail bond costs, shall be applied to the payment of said fine and/or costs." Under the unambiguous terms of this agreement, defendant's bail deposit was to be applied to the payment of, among other things, the $100,000 fine levied against him regardless of who put up the cash bond.

Section 110—7(h) of the Code of Criminal Procedure of 1961 supports this conclusion, as it specifically provides:

"After a judgment for a fine and court costs or either is entered in the prosecution of a cause in which a deposit had been made in accordance with paragraph (a) the balance of such deposit, after deduction of bail bond costs, shall be applied to the payment of the judgment." (Ill. Rev. Stat. 1985, ch. 38, par. 110—7(h).)

In construing a statute, we ascertain the intent of the legislature and give it effect, and the language of the statute is the best demonstration of legislative intent. (*People v. Rink* (1983), 97 Ill. 2d 533, 539, 455 N.E.2d 64.) Had the legislature wished to exclude those, other than defendants, who had deposited bond money from being subject to this provision, it could have said so. The statute, however, reveals no such intent.

Additionally, the supreme court of this State has determined that the proceeds of a 10% bond deposit are available for fine payment regardless of who may have furnished the money. (*People v. Nicholls* (1978), 71 Ill. 2d 166, 177, 374 N.E.2d 194.) In *Nicholls* the defendant contended that the result of applying money, put up by friends and relatives to secure an accused's release, to pay a fine or costs would be to discourage such relatives and friends from posting the accused's bail.

The supreme court relied on section 110—7(h) to point out that the purpose of the statute is not only to ensure a defendant's presence in court at an appointed time but also to constitute a fund from which a judgment for fine and costs against a defendant may be satisfied. (*People v. Nicholls* (1978), 71 Ill. 2d 166, 177, 374 N.E.2d 194.) Thus, the court concluded "[w]hether or not the cash received as bail is actually the property of the defendant is irrelevant." (71 Ill. 2d 166, 177, 374 N.E.2d 194.) We see no reason to depart from this conclusion, and, as we have, in fact, reached this same conclusion above, we find that the trial court properly refused to return the bail deposit provided by defendant's uncle, applying it instead to the court costs and $100,000 fine levied against the defendant.

Based on all the reasons given above, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

NASH and DUNN, JJ., concur.